## YATES v. BOTELER.

### No. 11444.

Circuit Court of Appeals, Ninth Circuit.
Oct. 20, 1947.

---

954

Cobb & Utley, of Los Angeles, Cal., for appellant.

Martin Gendel, of Los Angeles, Cal., for appellee.

Before GARRECHT, STEPHENS, and BONE, Circuit Judges.

GARRECHT, Circuit Judge.

On January 21, 1944, a representative from Dun & Bradstreet, Inc., a mercantile agency, called at the office of the Advance Welding Works, in Los Angeles, California, and asked the appellant, who owned and operated the establishment, to give him a financial statement.

The appellant refused to give a detailed financial statement, and told the representative that he had not been giving Dun & Bradstreet any reports and that he would rather not give any. Upon the insistence of the representative, the appellant finally gave round-figure estimates in response to certain questions asked by the caller.

The mercantile agency's representative had a printed form from which he asked six questions, out of a total of more than thirty questions on the form. The questioner wrote down the appellant's answers as they were given. He then asked the appellant to sign the statement, and the latter complied. In his testimony, the appellant variously estimated the length of the interview as five, ten, or fifteen minutes.

Thereafter, Dun & Bradstreet prepared a report containing much information not given by the appellant, but also accurately embodying the figures that he had given to the agency's representative.

Because the mercantile agency's report "showed a nice net worth" for the appellant's establishment, the Earle M. Jorgensen Company was "enabled * * * to extend a larger credit to them."

On March 6, 1945, the appellant filed a petition under the provisions of § 322 et seq. of Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 722 et seq. On April 2, 1945, he was adjudicated a bankrupt.

Thereafter, specifications of objections to the appellant's discharge were filed by the appellee. The only one here pertinent set forth that the appellant obtained credit from the Jorgensen company, and extensions of credit from other creditors, "by making a materially false statement in' writing respecting his financial condition, * * * that his total liabilities were in the sum of $4000, whereas in truth and in fact the same were in the sum of approximately $6,350.68; that said statement was further materially false in that he represented his total net assets as being $41,500, whereas in truth and in fact the same did not exceed $6,937.44."

On March 26, 1946, the referee signed findings of fact, conclusions of law, and an order denying the appellant's discharge. A petition for a review of that order was filed by the appellant, but was denied by

the court below, which affirmed the denial of the appellant's discharge. From the order of the lower court, the present appeal has been taken.

The referee made seven findings of fact, each of which is specifically attacked in the appellant's briefs. We will consider in detail each finding, seriatim, the appellant's objections thereto, and the supporting evidence.

In considering that supporting evidence, we should bear in mind that the referee's order denying the appellant's discharge was affirmed by the District Court. In such a situation, an appellate court is reluctant to disturb the referee's findings of fact, particularly where, as here, they are based largely upon conflicting evidence.

In Monson v. Hibler, 9 Cir., 24 F.2d 909, 910, this Court, citing many of its own decisions, said: "The judgment of a District Court on the facts will not be disturbed on appeal unless it is clearly against the weight of the evidence, or unless plain and manifest error exists; and this is especially true where both the referee and the District Judge have coincided in their conclusions."[1]

*1. The appellant gave in writing a financial statement to Dun & Bradstreet, Inc., on January 21, 1944.*

The appellant stoutly and elaborately insists that the "estimate" furnished by him to the mercantile agency was not a "financial statement". The gravamen of the appellant's objections seems to be that "many important questions [in the agency's form] were left unanswered"; and that "there was much information in the Dun & Bradstreet letter * * * which wasn't obtained, in writing, from the bankrupt".

We are not impressed with this argument. In his testimony, the appellant admitted that the statement distributed by Dun & Bradstreet contained the same figures that he had given to the agency's representative. The fact that other material was also included, and the possibility that the outside material might have con-

tributed to the granting of credit, does not excuse the appellant for the falsity of the information that he did give out. A creditor's *partial* reliance upon false information given out by the bankrupt is sufficient to bar a discharge. 1 Collier on Bankruptcy, 14th Ed., § 14.39, p. 1347; Id., 1946 Cum.Supp. p. 199.

Be that as it may, the evidence in this case affirmatively shows that it was upon the information furnished by the appellant that the creditor relied. In the following excerpt from the statement issued by Dun and Bradstreet, all the figures making up the assets and liabilities were supplied by the appellant: the totals, which we are enclosing in brackets, were filled in by the agency after the appellant had signed the statement at the close of the interview in his office:

| "Assets | |
|---|---|
| Cash in bank | $ 3,500.00 |
| Accts. Recv. | 12,000.00 |
| Merchandise | 5,000.00 |
| [Total current | $20,500.00] |
| Machy. & Fixts. | 25,000.00 |
| [Total assets | 45,500.00] |
| "Liabilities | |
| Accounts Payable | $ 4,000.00 |
| [Total current | 4,000.00] |
| [Net Worth | 41,500.00] |
| [Total | 45,500.00] |
| Net sales average $10,000." | |

From the foregoing it will be seen that the "Net Worth" total of $41,500 was derived solely and simply from the figures that had been supplied by the appellant: the assets as given by the appellant were totaled, the same was done with the figures that he had given for his liabilities, and the difference between those two totals, $4,500, was reported as the Net Worth of the Advance Welding Works. No alien hand tampered with the listing of the amounts that made up his assets and his liabilities: the figures were exclusively the appellant's.

[1] See also Beneke v. Moss, 4 Cir., 46 F.2d 948, 949; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805, 806; Albinak v. Kuhn, 6 Cir., 149 F.2d 108, 111. Cf. Faivret v. First Nat. Bank in Richmond, 9 Cir., 160 F.2d 827, 829, and Morris Plan Industrial Bank v. Henderson, 2 Cir., 131 F.2d 975, 977.

956

And it was, as we have already shown, precisely upon the Net Worth that the deceived creditor relied: "The financial statement showed a nice net worth and it enabled us to extend a larger credit to them."

Throughout his brief, the appellant harps upon the fact that the totals were made up by the mercantile agency, and insists that the trustee's specification of objection charges that the appellant, in the language of the brief, "made a materially false statement in writing with respect to *total* liabilities and *total* assets only."

There is no merit to this attack upon the appellee's specification. It is not contended that the computation made by the mercantile agency was not accurate, or that the items which made up the totals were not supplied by the appellant. He therefore is as responsible for the totals as for the component figures. Id certum est quod certum reddi potest.

Finally, it is contended that the creditor who relied upon the showing as to the appellant's net worth "only saw the letter written by Dun & Bradstreet, and not the estimated statement signed by the bankrupt." The speciousness of this argument is readily discerned when we remember that "a false statement made to a mercantile agency for general use is unquestionably a basis for the denial of a discharge." 1 Collier on Bankruptcy, § 14.42, p. 1357; In re Cloutier Bros., D.C.Me., 228 F. 569, 570.

Indeed, so unimportant is the *form* in which a false financial statement comes to the attention of the relying creditor, that even a false chattel mortgage has been held to be a "materially false statement in writing". In re Powell, D.C.Md., 22 F.2d 239, 240.

· 2. *The financial statement was given to Dun & Bradstreet by the appellant for the purpose of obtaining credit, and credit was extended to him thereon, particularly by Earle M. Jorgensen Co., which still remains an unpaid creditor in the bankruptcy proceeding in the sum of $4786.50.*

The appellant challenges the referee's finding that the financial statement was given to the mercantile agency for the purpose of obtaining credit, and points

to his own testimony to substantiate his contention.

But the referee, as a trier of fact, was not compelled to believe that testimony, which might well be regarded as self-serving. On the contrary, the record as a whole furnishes the basis for a reasonable belief that the appellant did give his statement to Dun & Bradstreet's representative for the purpose of obtaining credit.

The appellant is described by his counsel as being an unlearned man, unversed in the devious ways of accountancy. But we doubt that any practical business man of the present day could be so naive as to be unaware of the purpose for which credit agencies are established.

But if this untutored man needed a semaphore to guide him in his dealings with a modern mercantile agency, the blank form which the representative handed him to sign did itself contain that semiphore. At the very top of the sheet, in boldfaced "upper and lower" type, the purpose of the questionnaire is plainly disclosed:

"For the use of Subscribers as a Basis for Credit and Insurance".

As we have already seen in connection with the appellant's objections to Finding No. 1, "a false statement made to a mercantile agency *for general use* is unquestionably a basis for the denial of a discharge." 1 Collier, § 14.42, p. 1357, supra. And "the bankrupt's unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts." *Id.*, § 14.40, pp. 1353–1354.

Finally, the statute itself is concerned not with the *purpose* for which a false statement is issued, but with the *result* that it accomplishes. The text of 11 U.S.C.A. § 32 sub. c(3) follows: "The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * *".

It is significant that the statute in its earlier form, prior to the enactment of the Act of May 27, 1926, 44 Stat. 662, 663, did

contain the phrase, "for the purpose of obtaining credit from such person". We do not believe that the omission of these qualifying words from the later statute was merely an inadvertence on the part of Congress.

In any event, a man is presumed to intend the natural consequences of his acts. The "natural consequences" of the appellant's giving a statement of his financial condition to a representative of a mercantile agency were those outlined in the blank itself—it would be used by "subscribers as a basis for credit * * *"

*3. The information contained in the financial statement of January 21, 1944, was knowingly false. It was acted upon by the Jorgensen company to its detriment, since after the statement was received by that company, it extended additional credit to the appellant in the amount of at least $2160.*

The appellant's principal objection to this finding—except objections repeated by him elsewhere in connection with other findings—is that it "finds [sic] that the statement is false without mentioning any particular portion thereof."

If the referee's findings are examined in their entirety, however, it will be observed that in No. 4 and No. 5, infra, he goes into the details that, according to the appellant, are missing in No. 3.

In addition, the appellant objects to the referee's statement that "said creditor had had dealings with the bankrupt in November, 1943, and called upon Dun & Bradstreet, Inc. for a credit report on the bankrupt." As to this assertion, the appellant makes the following comment: "If there is any evidence that indicated that Earl [sic] M. Jorgensen Company had called upon Dun & Bradstreet for a credit report on the bankrupt we have been unable to find the same."

The evidence is, nevertheless, there. H. H. Ahlskog, credit manager for the Jorgensen Company, testified: "We applied at the time the account was opened for the Dun & Bradstreet report, in November, 1943."

*4. The appellant's books showed his net worth as of December 31, 1943, to be* $6937.44, *while the net worth reported in the financial statement of January 21, 1944, was $41,500, though there had been no substantial change in his assets since the former date. The accounts receivable in the financial statement totaled $12,000, while their actual total was only $3,691.84. Although the financial statement valued the machinery and fixtures at $25,000, the actual cost of these items as shown by the books was only $7,554.73, and the actual market value, because of wartime conditions, was $18,000.*

Under this heading, the appellant's sole criticism centers about the referee's acceptance of the trustee's estimate of $18,000, instead of the appellant's figure of $25,000.

Commenting upon the discrepancy between these two figures, the appellant says in its brief: "We have the opinion—and strictly opinion—of two men both qualified to pass upon values of this kind. Are either of them liars or trying to misrepresent the true situation? *We believe not*, but they have *honest* differences of opinion as to the value thereof," etc. [Emphasis supplied]

The variance in the opinions of the appellant and of the trustee as to the value of the machinery and fixtures constitutes a classical example of a conflict in testimony that it is within the peculiar province of a referee to resolve. As we have already shown, appellate courts are not inclined to disturb a referee's findings as to such matters, particularly when they have been adopted by the District Judge.

It is not the belief of counsel as to the honesty of a witness that is of decisive weight here. It is the belief of the trier of fact, who heard the testimony, that is highly persuasive if not wholly controlling in an appellate court.

*5. In preparing the financial statement furnished by him to Dun & Bradstreet, the appellant had before him monthly balance sheets showing accurately his financial condition, and showing that as of December 31, 1943, his net worth was $6937.44. Despite the fact that there had been no appreciable physical change in his assets since that date, the appellant in his financial statement reported his net worth to be*

*$41,500. The appellant did not supply copies of his balance sheets then in his possession to the mercantile agency.*

The appellant is, in part, technically, but not substantially, correct in his statement that this finding is not supported by the record. It is true that the testimony of the man who prepared the appellant's balance sheets indicates that the sheet for December 31, 1943, was probably not delivered into the appellant's hands before some time in February, 1944, or after the financial statement had been given to Dun & Bradstreet.

In quoting from the referee's finding on this point, however, the appellant omits all mention made by the referee of "balance sheets" generally, which were in the appellant's possession. The accountant who prepared these balance sheets for the appellant testified that his firm had brought the Advance Welding Works "up to date" from the middle of the year 1943, that from that time on it "rendered" the appellant's establishment "regular monthly statements", and that the balance sheet for November 30, 1943, was "probably" delivered to the Advance Welding Works prior to January 21, 1944, when the appellant talked with Dun & Bradstreet's representative and signed the financial statement.

Now, the November balance sheet showed the appellant's net worth to be $8,060.82, while, as we have seen, the net worth shown in the December sheet was $6,937.44. In other words, the November figure, as well as the one shown in the December balance sheet, was far below the $41,500 net worth reported by the appellant to Dun & Bradstreet.

But if, from a superabundance of caution, we were to decline to accept the probability that the appellant had the November balance sheet before him when he gave his financial statement to the mercantile agency, it is beyond cavil that there was available to him the *September* sheet, which showed his net worth to be $12,863.18— still greatly at variance with the reported $41,500 figure.

In this connection, and elsewhere in his brief, the appellant emphasizes that the representative of Dun & Bradstreet obtained the figures from the appellant "in

the haphazard fashion of a hasty interview", which lasted only five minutes.

The short answer to all this is that, if the interview was indeed hasty or haphazard, the fault lay with the appellant himself. According to the appellant's version, he refused to give a detailed financial estimate, said that he "would rather not give out any", and finally compromised by giving the agency's representative "round-figure estimates in response to certain questions."

The appellant blames the agency's "indifferent, inefficient, and loose manner" of handling his report, for whatever "misleading" information was received by the Jorgensen company. He also blames the representative for having been so "haphazard and hasty in his interview".

We do not believe that these strictures against Dun & Bradstreet and its interviewer are justified.

In the first place, the appellant misconceives the relationship of the parties when he describes Dun & Bradstreet as "the agent of the creditor and not of the bankrupt". This is not the law.

In Re Cloutier Bros., supra, 228 F. at page 570, the Court said: "The mercantile agency is to be regarded as the representative of the debtor, and his agent for the purpose of obtaining credit by means of exhibiting a false statement."

In the second place, the appellant was under no compulsion, either legal or moral, to give out any statement whatsoever. But having elected to release certain figures pertaining to his business, it was his duty, both legal and moral, to see to it that those figures were as accurate as he could make them. It is clear that he did not put out the necessary effort to make his information conform to this high standard. If the interview was hasty or haphazard, it was, we repeat, the appellant's fault.

In Morris Plan Industrial Bank v. Lassman, 2 Cir., 116 F.2d 473, the court said: "When a lender asks a borrower how much he owes, and the borrower sets a figure without qualification, the lender properly understands that the borrower is telling what he knows; not indeed accurately to

the cent, but certainly that he is not speaking at random. If he is merely guessing at the right amount—which it is necessarily within his power to ascertain—his answer is untruthful unless he in some way conditions it. It may be morally worse to tell what he knows to be false, but it is as deliberate a deceit to give an appearance of accuracy to what one knows to be a shot in the dark." [Many cases cited]

*6. The appellant's offer of proof as to the activities of his employees subsequently to January 21, 1944, could not in any way affect the truth or falsity of the financial statement prepared by him on that date.*

█ The offer of proof rejected by the referee related to alleged "embezzlements" committed by the appellant's bookkeeper and the appellant's general manager on dates subsequent to the signing of the financial statement of January 21, 1944.

It would serve no useful purpose to set out the alleged irregularities in detail, since we agree with the referee that they could not affect the truth or falsity of the statement of January 21, 1944. Suffice it to say, we have carefully read the proffered evidence, and find it wholly irrelevant to the issues here presented.

*7. The appellant prepared the financial statement of January 21, 1944, and furnished it to Dun & Bradstreet for credit purposes, knowing that the information and amounts contained therein were false. Even if he did not actually know that the information was false, he furnished it with such a reckless and willful disregard for the truth that his conduct was tantamount to an express knowledge of the falsity of the information.*

█ The appellant's first objection to this finding is that it is squinting. "We fail to see how the evidence can support both theories," he declares.

A careful reading of the finding, however, discloses that it is in the alternative. Such a finding is permissible, especially when it deals with a party's state of mind, or intent, and where the legal consequences are the same no matter which alternative is accepted.

█ The word "false" as used in 11 U.S.C.A. § 32, supra, has been defined by the Supreme Court as being "made and acquiesced in either with actual knowledge that it was incorrect, or with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct." Morimura, Arai & Company v. Taback, 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586.

The rest of the appellant's argument under this heading is devoted to placing the blame upon Miss Irma Bernardi, who is described in the brief as an "inexperienced bookkeeper", for the appellant's misstatement of his accounts receivable. Miss Bernardi, it should be noted, was not the bookkeeper who was accused of irregularities.

The appellant testified that, when he was interviewed by the mercantile agency's representative, he turned to Miss Bernardi and asked her what the figures for the accounts receivable were. She then gave him the amount that appears upon the financial statement of January 21, 1944. That amount, $12,000, was admittedly erroneous, because it did not reflect the fact that $5,654.85 of the accounts had been factored with Universal Factors, less a reserve of $626.07.

This item of accounts receivable, however, is the only one as to which the evidence showed Miss Bernardi erred. It is true that she did give the appellant the figures on the cash in bank and the accounts payable. The estimates on the merchandise and on the machinery and fixtures, however, were admittedly made by the appellant himself and given by him to the agency's representative.

The appellant testified on at least three separate occasions regarding his interview with the man from Dun & Bradstreet. Although there were some discrepancies in these three statements, we have adopted in the foregoing paragraph the version selected in the appellant's brief; namely, that the estimates on the worth of the merchandise and of the machinery and fixtures were the appellant's own.

In our discussion of Finding No. 4, supra, we have pointed out that there was support in the record for that finding, to the effect that, although the financial statement valued the machinery and fixtures at $25,000, the actual market value, because of wartime conditions, was $18,000. For that false estimate, at least, the "inexperienced bookkeeper" could not be blamed.

As to the appellant's general argument "that a business man has a right to rely upon his bookkeeper," we may make the passing observation that the tendency among business men to blame their subordinates for their own shortcomings is so common as to be almost a matter of judicial notice. We do not rely, however, upon judicial notice in connection with this familiar fact of life, since, as we have just seen, the record makes such reliance unnecessary.

As we scan the entire transcript, we are compelled to the conclusion that the appellant has not discharged his heavy burden in this court of overturning the referee's findings on conflicting evidence, after those findings have been adopted and the referee's order based thereon has been affirmed by the District Judge.

Accordingly, the order of the court below is affirmed.