In the Matter of Albert M. **BARBATO**, Bankrupt,

**Royal Indemnity Company**, a Corporation of the State of New York (a creditor), Appellant.

No. 17965.

United States Court of Appeals, Third Circuit.

Argued Dec. 18, 1969.

Decided Feb. 9, 1970.

James E. Masterson, Kleinberg, Moroney, Masterson & Schachter, Newark, N. J., for appellant (Stickel, Kain & Stickel, Newark, N. J., on the brief).

Herman Osofsky, Kronman & Osofsky, Passaic, N. J., for bankrupt.

Before McLAUGHLIN, FREEDMAN and ADAMS, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

In this bankruptcy matter, a bonding company creditor objected to the discharge of the bankrupt contractor. The Referee, holding that the bankrupt by his statement of December 31, 1963 had no actual intent to deceive the bonding company, allowed the discharge of the bankrupt. The District Court confirmed that decision. On appeal this court remanded the case for further proceedings to ascertain whether the bankrupt had sustained his burden of establishing that he was not recklessly indifferent to the actual facts in issuing his said statement.

In accordance with the above directive the Referee held a further hearing and as a result thereof made detailed additional findings of fact and conclusions of law. These found that the bankrupt had been in the construction business for many years prior to 1963. On entering that business he engaged a certified public accountant as his accountant. The latter set up the bankrupt's books on a cash basis. On the recommendation of the accountant, he hired a bookkeeper to take care of his business books and records. The semi-annual statements required by the bonding company were prepared by the accountant from those books and records and from schedules of receivables and payables compiled by the bookkeeper. The bankrupt checked the statements as to their accuracy and the accuracy of the schedules and receivables and payables. He asked questions about every item which did not seem to him to be correct. There were times when conferences with the

bookkeeper and accountant were necessary and when changes had to be made. The bankrupt examined the figures and accompanying schedules of the December 31, 1963 statement, "and satisfied himself that they were accurate, with respect to all the information of which he had knowledge." In January 1964 when his statement was given to the bonding company, the bankrupt "had the pleasant feeling that he was doing as well in the construction business as the statement indicated." In February 1964, "the bankrupt first became aware of the fact that he would suffer a financial loss on the United States Picatinny Arsenal job and he also knew that he faced a heavy income tax on his 1963 operations." He consulted and retained another accountant, Mr. Comperatore, who specialized in tax matters. That accountant "by working backwards to January 1, 1964 set up the Bankrupt's books on an accrual (as opposed to a cash) basis. That accountant also prepared bankrupt's income tax return which the bankrupt signed on or about March 14, 1964."

The tax accountant testified that the bankrupt's books were properly kept on the cash basis employed. On cross-examination he agreed with the attorney for the creditor that "Cash systems are used and permitted by the Internal Revenue." He explained that "it takes into consideration certain accounts receivable and certain accounts payable, the accounts receivable that have been received as of the date of the statement and the accounts payable that have been received as of the day of payment." As to amounts owed by the bankrupt other than appeared in his statement, the tax accountant said "He never received those invoices and had no knowledge of those accounts payable when I walked in there." Even after the witness had prepared the bankrupt's tax return on an accrual basis which showed substantial further indebtedness the witness stated that *"I don't believe Mr. Barbato knew the full impact of his problems."* Asked "Do you know why he wouldn't know of

it?", the witness answered *"My opinion, it was because of the method of accounting used, this cash basis."* (Emphasis supplied.)

The bankrupt, recalled to the stand, testified that there were large losses in January and February 1964 in connection with the completion of the Picatinny job; increased payroll, equipment, including "duplication of material purchases again in January, February and March that were on the job prior to that, and then they weren't there anymore." In his main testimony he made it very clear that he had had no experience with bookkeeping. Asked, "Did you ever keep books for yourself?", he answered "No, I always had the accountant." He said that his work was always in the field, on the job itself.

It is unchallenged that the bankrupt relied upon Stier, his first accountant, and the cash system he installed; as the creditor's attorney stated "here is the Bankrupt under my own questioning still of the opinion that all he owed is $92,000." Immediately thereafter the attorney asked the bankrupt "What did you do to insure the accuracy and the completeness of the invoices which you directed your girl to make available to Mr. Stier for the statement?" The bankrupt answered "They were all the ones that I saw that they gave to me that I received in the mail and that they gave to me and I had given jobs out. In other words that I had knowledge of. They were all there." The bankrupt stated as to the $92,000. total "That is all I owed, as far as I had knowledge of, the bills that we actually owed. There were three other people that verified it with me, that works with me." Queried as to what efforts he made to ascertain that this was all he owed he answered "Because I had made all the efforts I can. That's all the bills I had, that's all the knowledge I knew that I owed." It is conceded that the bankrupt did not issue any statement after the one as of December 1963.

Mr. Comperatore, the tax accountant, whose testimony is in nowise impugned

testified that "The full impact (of the business losses) even wasn't known beyond the time I prepared the federal income tax 'return, because it got worse as time went on. The situation got worse, the disclosures were coming into play here, bills coming from people that were assumed paid, or situations like this, where a bill would—well, let me see if I can think of an example. I recall there was one company that I didn't even list on the listing. This I come up with because there was no way of knowing this amount unless you were a superintendent or foreman out in the field, that this particular item was ordered and used. It wasn't in the basic contract, to my knowledge. It was an extra and the only way the office would ever know about it is by getting a bill received." Questioned as to whether the bankrupt "could not have known of the particular items you indicate you did learn of when the report was submitted to the bonding company as of December 31st?", Mr. Comperatore replied "Not a man of his caliber. I don't think he would know, or any man equivalent to him in the construction business. *Usually they rely very heavily on the certified public accountant.*" (Emphasis supplied.) Asked "Well, what is there about Mr. Barbato's position that made him liable for less than $354,000 at the end of 1963?", Mr. Comperatore answered "If I was in Mr. Stier's position I think I would have come up with the same conclusion under the cash basis. If I would have come in there and examined his books under the cash basis, I believe I would have come up with the same conclusion that Mr. Stier did, and prepared the balance sheet the same way Mr. Stier did. I think I did under the cash basis."

From the above rehearing record the Referee found as a fact that "Actually the Bankrupt still does not realize that the statement of financial condition as of December 31, 1963 was false. He is convinced he was doing well financially until sometime in February, 1964. The Bankrupt's schedule of his outstanding obligations in his financial statement of December 31, 1963 was not made with reckless indifference to the actual facts. On the contrary, the Bankrupt made a conscientious effort to have the schedule include all of his outstanding obligations as of that date, in accordance with the procedures set up by Mr. Stier."

The Referee held in his "Conclusions of Law" that "In submitting the materially false statement in writing respecting his financial condition, the Bankrupt did not intend to deceive Royal Indemnity Company, nor did he make the statement with reckless indifference to the actual facts."

The District Court, in passing upon the Referee's decision, held that "The testimony before the Referee indicated that the bankrupt was operating on a cash system of accounting on the date he made his financial statement. Based on that accounting system it appeared that his financial condition was sound. It was not until March of 1964, that is, after his accounting system had been converted to an accrual basis that the bankrupt became aware of the falsity of his financial statement.

"The evidence is thus fully supportive of the Referee's finding that the Bankrupt had acted from an honest mistake rather than from a reckless indifference to his financial condition. Accordingly this Court affirms the Referee's findings of fact and conclusions of law."

The bankrupt did not send in an amended statement after March 1964. It will be remembered that the undisputed situation was that the full impact of the business losses wasn't even known to the tax expert until beyond that time "Because it got worse as time went on." It must also be borne in mind that Barbato who was experienced in the actual construction field work undeniably knew nothing of ordinary sound bookkeeping let alone the intracacies, particularly the pitfalls, of cash system accounting. Unquestionably he accepted the work system and work product of his accountant and the accountant's choice of bookkeeper. As Mr. Comperatore testified, con-

tractors of Barbato's type "rely very heavily on the certified public accountant." In this instance the trust was mistakenly placed. Barbato, indoctrinated into the cash system through his profit making years still cannot accept the proposition that he was far more heavily in debt than the cash method revealed. There are strong indications from the transcript that he may have seriously underbid the Arsenal work. Theft of valuable materials, being charged twice for important equipment, expanding payrolls to quickly finish up the work, all seem to have had substantial impact on the indebtedness that eventually piled up.

In our view the findings and conclusions of the Referee as confirmed by the District Court that the bankrupt with reference to his financial statement acted from honest mistake rather than from a reckless indifference to his financial condition, are justified by the record. As in the landmark case of Morimura Arai & Co. v. Taback, 279 U. S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1928) there is not the slightest inference that the bankrupt's statement was issued "* * * with no reasonable ground to believe that it was in fact correct." The latest reported opinion in the particular field which is strikingly similar in fact and decisionally with this appeal is Jayne Meadows Travel Agency v. Dashiell, 416 F.2d 1253, 1254 (9 Cir. 1969). There the bankrupt was discharged over the objection of the appellant creditor. He stated that all his books and records had been given to the trustee. It developed that the bankrupt's accountant had neglected to turn over a certain journal and ledger which were located in cold storage. The Court held "The referee found that the bankrupt's dereliction was not wilfull and was excusable. The district court agreed and so do we. Whether justification existed is an issue of fact which was resolved against appellant (a creditor). Rivas v. Jefferson, 9th Cir., 412 F.2d 769, decided June 24, 1969. The question of the right to a discharge is ad-

dressed to the sound discretion of the bankruptcy court with the exercise of which, except in case of gross abuse, an appellate court will not interfere. Burchett v. Myers, 9th Cir. 1953, 202 F.2d 920." We agree with that sound expression of the controlling law in the issue before us.

The judgment of the District Court will be affirmed.