In re Paul L. BARRETT and Catherine A. Barrett, Individually and Jointly, Bankrupts.

BENEFICIAL CONSUMER DISCOUNT COMPANY OF LANCASTER, PENNSYLVANIA, Plaintiff,

v.

Paul L. BARRETT and Catherine A. Barrett, Individually and Jointly, Defendants.

Bankruptcy Nos. 78–828 to 78–830.

United States Bankruptcy Court, E. D. Pennsylvania.

Jan. 23, 1980.

H. Joseph Flynn, Lancaster, Pa., for bankrupts.

J. Richard Gray, Lancaster, Pa., for Beneficial Consumer.

Michael J. Rostolsky, Lancaster, Pa., trustee.

Jacques H. Geisenberger, Jr., Lancaster, Pa., for trustee.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

The proceedings before this Court concern the dischargeability of a certain debt based upon a loan allegedly made in reliance upon a false financial statement.[1]

In June, 1976, defendant-bankrupts borrowed $3,500 from plaintiff, Beneficial Con-

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 752.

sumer Discount Company ("Beneficial"). On April 25, 1977, the bankrupts applied to Beneficial for a loan of an additional $1,000. Consequently, the original loan was refinanced, thereby incorporating the amount of the new loan as well.

Defendants initially communicated some preliminary credit information to plaintiff via telephone. Notes of Testimony [hereinafter cited as N.T.] at 19–20, 26, 37. As part of the loan application procedure, defendants were asked to list all of their debts in a credit statement, which statement Paul Barrett completed and both he and his wife signed (Exhibit D–2). The outstanding debts listed on the statement correlated with those which the bankrupts had telephoned to James Foley, Beneficial's branch manager, who handled the Barrett loans.

Defendants represented that they had a net monthly income of $1,260 and fixed monthly expenses of $628. Mr. Foley calculated that defendants thus had $632 available monthly for variable living expenses, and that the ratio of fixed monthly expenses to monthly net income ("debt ratio") equalled 49.84 percent, a marginally acceptable figure. N.T. at 9–10.

On April 26, 1977, the original loan to defendants was refinanced and they received an additional $1,100 in "fresh cash." Defendants made full monthly payments of $140.47 for three months, then, with the plaintiff's permission, made monthly payments of $70 for the next eight months.

On June 9, 1978, defendants both filed a voluntary petition in bankruptcy. On July 25, 1978, plaintiff filed a complaint to determine the dischargeability of the total refinanced debt in the amount of $5,546.60 (N.T. at 11), pursuant to § 17c of the Bankruptcy Act (11 U.S.C. § 35(c) (repealed 1978)) and Bankruptcy Rule 409, claiming that the defendants omitted from the list of debts on the credit statement completed on April 26, 1977, two debts—one to TSO, Inc. and another to BankAmericard, both incurred prior to the completion of the credit statements. The debt to TSO alone totalled $10,240 and monthly payments on account of that debt were $147.

Section 17a(2) of the Bankruptcy Act (11 U.S.C. § 35(a)(2) (repealed 1978)) renders nondischargeable those debts which arise due to the use of a false financial statement.[2]

The question of dischargeability of debts in bankruptcy is a federal question. *In re Meyers*, 1 BCD 1651, 1652 n.4 (E.D. Mich.1975). The degree of proof which the plaintiff must offer in order to succeed is that degree of evidence which is "clear and convincing." *In re Barlick*, 1 BCD 412, 418 (D.R.I.1974); *In re Brown*, 6 Collier Bankruptcy Cases 679, 683 (E.D.Va.1975).

In order to succeed on a § 17a(2) complaint to determine the dischargeability of a debt, the plaintiff-creditor must show, by clear and convincing evidence, the following: (1) that the bankrupt made the representations; (2) that at the time the representations were made they were materially false (*i. e.,* substantially untrue); (3) that the bankrupt made the representations with the intention and purpose of deceiving the creditor (or that they were made carelessly or with reckless indifference to the actual facts); (4) that the creditor relied on such representations; and (5) that the creditor sustained the damage alleged as the proximate result of the representations having been made.[3] *Cf. In re McMillan*, 579 F.2d 289, 292 n.5 (3d Cir. 1978); *In re Houtman*, 568 F.2d 651, 655 (9th Cir. 1978);

---

2. Section 17a(2) provides, in pertinent part:

    a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as . . . (2) are liabilities for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive . . . .

3. For a full discussion on the elements of a § 17a(2) objection, see this Court's recent treatment of that subject in *In re Tomeo*, 1 B.R. 673 (E.D.Pa.1979). We rely heavily here on the § 17a(2) analysis that this court adopted in that opinion. Note in particular our view on the definition of "materially false" in relation to the "intent to deceive" requirement of § 17a(2).

*In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975); *Sweet v. Ritter Finance*, 263 F.Supp. 540, 543 (W.D.Va.1967).

■ The creditor must carry the burden of persuasion on all five of the above-listed elements. However, once the creditor has made a *prima facie* showing that the debtor made a materially false representation in writing and that the creditor relied upon such representation to its detriment, the burden of production, *viz.*, the burden of going forward with evidence to show that the bankrupt had no intention to deceive the creditor, shifts to the bankrupt. *In re Tomeo, supra. See In re Matera*, 592 F.2d 378 (7th Cir. 1979). *See also In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975).[4]

What happens mechanically, then, is this: Once the creditor has made its *prima facie* case, a presumption arises that the debtor made the representations with "intent to deceive." At that point, the burden of going forward with evidence to the contrary (not the burden of persuasion) shifts to the debtor.

■ The treatment to be accorded that presumption is governed by Rule 301 of the Federal Rules of Evidence, made applicable to bankruptcy proceedings and cases by Rule 1101 of the Federal Rules of Evidence.[5] The effect of the presumption in a

4. This shift in the burden of going forward in § 17a(2) complaints to determine the dischargeability of a debt parallels the shift in a § 14c(3) objection to discharge, as applied by the courts in their interpretation of Bankruptcy Rule 407, which governs the burden of persuasion in § 14c(3) cases. *See* Bankruptcy Rule 407 and the Advisory Committee Note following; 1A *Collier on Bankruptcy* ¶¶ 14.12, 14.43 (14th ed. 1978).

The rationale for the shift in the burden of persuasion in § 14c(3) cases is set forth in the Advisory Committee Note to Bankruptcy Rule 407:

. . . [T]he rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of such considerations as the difficulties of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector.

See also 1A *Collier on Bankruptcy* ¶ 14.43 at 1407 (14th ed. 1978).

Rule 407 superseded the proviso of § 14c and there has been some debate about whether Rule 407 is constitutional. *See, e. g., In re Decker*, 595 F.2d 185, 189 n.4 (3d Cir. 1979). However, the constitutional issue has no bearing on the case at bar, since (1) Rule 407 is inapplicable to § 17a(2) complaints to determine the dischargeability of a debt and (2) the Advisory Committee's Note, quoted above, states a general principle which operates independently of the Bankruptcy Rules.

5. Federal Rule of Evidence 301 is as follows:
Presumptions in General in Civil Actions and Proceedings

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

*Conference Report*

Under the [Rule as enacted], a presumption is sufficient to get a party past an adverse party's motion to dismiss made at the end of his case-in-chief. If the adverse party offers no evidence contradicting the presumed fact, the court will instruct the jury that if it finds the basic facts, it may presume the existence of the presumed fact. If the adverse party does offer evidence contradicting the presumed fact, the court cannot instruct the jury that it may presume the existence of the presumed fact from proof of the basic facts. The Court may, however, instruct the jury that it may infer the existence of the presumed fact from proof of the basic facts.

There exist a number of decisions stating the principle that "fraud is never presumed." *See, e. g., In re Brown*, 6 Collier Bankruptcy Cases 679, 684 (E.D.Va.1975) (and the cases cited therein, most of which involve non-bankruptcy questions). Viewed in context, that "principle" has been used generally by courts in efforts to state that in cases in which fraud is an issue, the complaining party must prove such fraud by clear and convincing evidence and that whether or not fraud has occurred cannot be "left to mere speculation." *See, e. g., General Finance Corp. v. Fidelity and Casualty Co. of New York*, 439 F.2d 981 (8th Cir. 1971). When these courts speak of "no presumption of fraud" in the standard of proof context, the word "presumption" is not to be taken in its literal sense, *i. e.*, a rule " 'attaching to one evidentiary fact certain *procedural consequences* as to the duty of production of evidence by the opponent.' " Hecht and Pinzler, Rebutting Presumptions: Order Out of Chaos, 58 *B.U.L.Rev.* 527, 528 (1978), *quoting* 9 J. Wigmore, *A Treatise on the Anglo-American*

§ 17a(2) case causes the debtor to be charged with a duty to come forward with some evidence that he had no intention of deceiving the creditor. At this juncture, the credibility of any such evidence introduced by the debtor is not legally relevant: "the mere introduction of evidence rebutting the presumed fact causes the presumption to disappear from the case." Hecht and Pinzler, Rebutting Presumptions: Order Out of Chaos, 58 *B.U.L.Rev.* 527, 527–533 (1978) (this approach has been referred to as the Thayer "bursting bubble theory").[6]

We now turn to the evidence presented in this case.

First, defendants do not deny that they submitted the financial statement in question. Neither is it disputed that, at the time of applying for both the initial loan and at its refinancing, defendant Paul Barrett knew that the information listed on the respective financial statements included an incomplete list of creditors.[7] Hence, it is admitted by the bankrupts that representations were made, thereby satisfying the first § 17a(2) requirement listed above.

Second, it must be determined whether the bankrupts' representations were materi-

ally false, *i. e.*, substantially untrue. *See In re Tomeo, supra.* We conclude that the omission on the April, 1977 credit statement of the debts owed to TSO, Inc. and BankAmericard rendered that statement materially false within the meaning of § 17a(2).

The testimony of James Foley, branch manager for plaintiff, makes it clear that the information supplied by the applicants about their total indebtedness was a crucial factor in the evaluation of their creditworthiness and ability to repay. N.T. at 6–30. The use of a debt ratio is accepted practice for lending institutions; thus, credibility is accorded Mr. Foley's testimony concerning plaintiff Beneficial's development of a debt ratio and its role in the procedure employed in deciding whether to grant a loan. Foley testified that if the ratio of fixed monthly expenses to net income exceeds fifty percent, it is strict company policy not to make the loan (N.T. at 7–10).

The addition of the TSO, Inc. debt alone to those listed by Paul Barrett on the application for refinancing of the loan would have increased the debt ratio far beyond its allowable limit. Mr. Foley testified that, even without the two debts to BankAmeri-

System of Evidence in Trials at Common Law § 2491 at 288 (3d ed. 1940). What these courts are asserting, apparently, is this: that "fraud 'must be affirmatively established by clear and convincing proof of each and every essential element.'" *Mack v. Earle M. Jorgensen Co.*, 467 F.2d 1177, 1179 (7th Cir. 1972).

This is entirely consistent with the use of a Rule 301 presumption in a § 17a(2) case, since the use of such a presumption operates, as outlined in this opinion, to shift the burden of going forward with evidence to the bankrupt in certain circumstances. The Rule 301 presumption *never* causes the shift of the plaintiff's burden of persuasion.

**6.** However, the "bursting of the bubble" does not necessarily dilute the strength of the logical inferences which have arisen as a result of the plaintiff-creditors' evidence. Hence, *it is* quite possible that, even if the debtor has come forward with evidence that he did not intend to deceive the creditor, thereby effectively rebutting the presumption, ("bursting the bubble") the court may still choose to disbelieve the debtor's evidence. Therefore, the plaintiff-creditor could carry its burden of persuasion if the logical inferences created by the evidence showed clearly and convincingly that the debt-

or performed the acts alleged with intent to deceive the creditor. *In re Matera*, 592 F.2d 378 (7th Cir. 1979), *citing In re Nelson*, 561 F.2d 1342, 1346–1347 (9th Cir. 1977).

**7.** To the extent that plaintiff asserts that it relied upon the June, 1976 credit statement (Exhibit D–1), either in granting the original loan or at its refinancing, we find that the plaintiff failed to carry its burden of persuasion by failing to show: (1) that any representations made by the bankrupts were made with the requisite intent to deceive; (2) that the plaintiff relied on any such representations; or (3) that the plaintiff suffered any damage as a result thereof.

Therefore, notwithstanding the admitted fact that credit statements containing an incomplete list of creditors were submitted at the time of the original loan and at its refinancing, we are concerned here only with the effect of the April, 1977 *credit statement upon the refinancing of the original loan and the resultant consequences thereof in bankruptcy.* This narrowing of issues results from both parties having framed the issues and their proofs at trial and in their briefs in this manner.

card and TSO, Inc., the debt ratio of 49.84 percent was marginal, so that he had to seek permission from his field supervisor to grant the loan. (N.T. at 9.) The additional $147 monthly payment to TSO, Inc. would have raised the debt ratio to 61.51 percent. Moreover, the addition of the $10,240 debt to TSO, Inc. would have swollen the defendants' total indebtedness, excluding the $33,-000 mortgage, from $7,450 to $17,790.

In *In re Hadley*, No. 76–665–T (M.D.Fla. March 31, 1977), the creditor also relied heavily on a debt ratio based upon a credit statement submitted by the loan applicants. That creditor's loan policy provided that whenever the ratio exceeded fifty percent, no loan could be granted without the approval of the home office. The court found the financial statement to be materially false, citing, in addition to the effect of the omitted debts on the debt ratio, the number and amount of unlisted liabilities, the additional monthly service requirement, and the testimony of plaintiff's agent that plaintiff would not have lent the bankrupts any money if all the debts had been disclosed. So here, as in *Hadley*, there exists as sufficient evidence of materiality more than unsubstantiated testimony of an employee of the objecting creditor that the loan would not have been made but for the incomplete financial statement. See *Universal C. I. T. Credit Corporation v. Tatro*, 416 S.W.2d 696 (Mo.App.1967); *Tower Finance Corporation v. McLarning*, 83 Ill.App.2d 250, 227 N.E.2d 375 (1967).

Therefore, it can be seen that the omission of the TSO, Inc. and BankAmericard debts was material (*i. e.*, substantial, important).

Mr. Barrett asserts that the statement was not false (or untrue) because he thought that he was expected to list only local credit references. N.T. at 37. That claim does not stand close scrutiny. Both Paul and Catherine Barrett had considerable experience in applying for credit. At the time of the application for refinancing of the loan from plaintiff, defendants apparently owed money to four banks, two credit card companies, and three loan companies. They were not unsophisticated borrowers.

In addition, the credit statement signed by the Barretts contained emphatic instructions:

## PLEASE READ THESE INSTRUCTIONS

Before completing and signing this statement below *PLEASE REVIEW* all your debts carefully. Be sure you have disclosed ALL YOUR DEBTS of all kinds and that the facts stated in this statement are correct. *DO NOT OMIT ANY DEBTS.* We rely upon your good faith and the truth of your representations. For your protection against an over extension of credit, you are requested above to list each and all of your debts, liabilities and claims against you which are in excess of $25.00. If you have no other debts, liabilities, etc., please initial the box alongside statement below and affix your signature beneath it.

Exhibit D–2. These instructions unequivocally direct the borrower to list *all* of his or her debts.

Moreover, the language of the oath which Paul Barrett signed expressly refutes his argument that he was requested to list only certain debts:

I have no debts and liabilities in excess of $25.00 other than those listed hereon. I certify that I have not been instructed by the Lender to which I have made an application for a loan to list only certain debts. Instead my instructions have been to list all outstanding debts and liabilities.

Exhibit D–2; N.T. at 31–32. Mr. Barrett argues that he did not read the oath before he signed it. Even if that were true, defendant's contention is not legally relevant under these circumstances. The court will not now shield an intelligent, educated man, who had ample opportunity to read what he signed, from his own carelessness under these circumstances. In completing the form, he must, by necessity, have been looking at the page for a period of time sufficient to apprise him of its contents. It was not a situation in which an ignorant bor-

rower signed the dotted line on a piece of paper thrust in front of him, then whisked away. Finally, in view of Mr. Barrett's extensive borrowing experience, it is reasonable to expect that he be familiar with the language of such oaths.

Courts have consistently held debts to be nondischargeable when the bankrupt had similar excuses for the falsity of the financial statement. In *In re David Carroll*, 2 Bankr.L.Rep. (CCH) ¶ 65,160 (S.D.N.Y. 1974), the bankrupt argued that he was unaware of the need for complete disclosure and that he did not read the application before signing. The court ruled that the bankrupt was liable on the debt, also noting that the bankrupt was experienced in applying for credit.

Third, it must be determined whether the plaintiff relied on the materially false credit statement in deciding whether to refinance the Barretts' loan. From the testimony given (*see* N.T. at 19–22), we find that the following is a reasonable and accurate account of the sequence of events concerning the loan transaction in question:

On April 25, Mrs. Barrett telephoned James Foley at the Lancaster office of plaintiff to inquire about a loan. Mr. Foley phoned Mr. Barrett at work to question him about his financial situation. That same day, Foley checked previous credit information supplied by the defendants, and, in addition, consulted a finance exchange. Based on all the data thus acquired, Foley made several calculations which are influential in the decision-making process for loan applications, including balance of monthly income available for variable living costs and a "debt ratio." Because the latter computed figure was so high, Mr. Foley called his field supervisor for permission to make the loan. N.T. at 9. The permission was granted.

Mr. Foley then made a preliminary decision to make the loan. He called defend-

ants on April 26 to schedule an office appointment. There, defendant Paul Barrett filled out the credit statement (Exhibit D–2), purporting to list all of his debts, and both defendants signed it. Foley compared the statement with the information he had compiled (Exhibit D–3) and found the data to be consistent. He then had both defendants sign the note of indebtedness, after cancelling the original note, and he gave defendants the "new" $1,100.

It thus appears that Foley, as agent for the plaintiff, relied heavily on the accuracy of the credit information given to him by defendants on April 25 and April 26 in deciding to grant defendants a loan of an additional $1,100 and to refinance the original $3,500 loan. The final decision was not made until defendants signed the note on April 26 when Foley actually advanced defendants the money.

Defendants argue that plaintiff did not rely solely on the written financial statement executed by them, but also relied on other information. We agree with the defendants' factual observation, but not with their legal conclusion that this vitiates plaintiff's reliance on the financial statement. Partial reliance on the financial statement is sufficient to render the debt thereby incurred nondischargeable in bankruptcy. *See, e. g., Rogers v. Gardner*, 226 F.2d 864, 867 (9th Cir. 1955); *Yates v. Boteler*, 163 F.2d 953, 955 (9th Cir. 1947); *Mullen v. First Nat'l Bank of Ardmore*, 57 F.2d 711, 713 (10th Cir. 1932); *In re Applebaum*, 11 F.2d 685, 686 (2d Cir. 1926); *In re Clancy*, 279 F.Supp. 820, 822 (D.Colo.1968); *Chandler v. Household Finance Corp.*, 2 Bankr.L.Rep. (CCH) ¶ 61,520 (D.Tenn.1965); *In re Curtiss*, 40 F.Supp. 495 (D.N.J.1941), aff'd, 125 F.2d 158 (3d Cir. 1942); *In re Philpott*, 37 F.Supp. 43, 46 (S.D.W.Va.1940); *In re Muscara*, 18 F.2d 606, 607 (W.D.Pa. 1927); *Assocs. Consumer Finance Co. v. Crapo*, 21 Mich.App. 195, 175 N.W.2d 315 (Mich.1970).[8]

---

8. Most of the above-cited cases discuss reliance on a false written financial statement in the § 14c context; these cases are analogous to the present one, because the § 17a(2) bar of the discharge of a debt for making a false statement in writing respecting financial condition is derived from § 14c. Therefore, the reasoning in § 14c case regarding reliance is equally applicable in the § 17a(2) context. *But see In re Tomeo*, 1 B.R. at 677 n. 5 (E.D.Pa.1979).

Mr. Barrett also asserts that he thought his credit reputation good enough that a loan would be granted regardless of his other indebtedness—that the credit statement was a mere formality on which the plaintiff would not rely. N.T. at 37–38. The Barretts already had two loans outstanding with plaintiff and were undoubtedly familiar with Beneficial's procedures, in particular, as well as with the importance of a credit statement in general. We find that plaintiff did rely primarily and reasonably on the accuracy of the materially false credit statement (Exhibit D–2), completed by Paul Barrett and signed by both defendants, in deciding whether to permit refinancing of the loan. Any reliance placed upon independently obtained information or upon confidence in the defendants inspired by previous loan transactions was minimal, or at least did not decrease plaintiff's reliance on the representations of defendants about their financial condition. Indeed, the evidence shows that the inclusion of the debt to TSO, Inc., in the statement would have nullified any reliance placed by plaintiff-creditor in other factors and induced plaintiff not to make the loan to defendants.

■ Fourth, for a debt to be rendered nondischargeable, the debtor need have made the false representations with the intention and purpose of deceiving the creditor. *In re McMillan,* 579 F.2d 289, 292 (3d Cir. 1978). *See also Schapiro v. Tweedie Footwear Corp.,* 13 F.2d 876, 878 (3d Cir.

1942). The type of fraud required to bar discharge of the debt is actual fraud involving moral turpitude. *In re McMillan, supra, citing Wright v. Lubinko,* 515 F.2d 260, 263 (9th Cir. 1975). What is required, then, is that there must have been some degree of fraudulent intent on the part of the bankrupt. The bankrupt must have had some degree of awareness of the falsity, or potential for falsity, of his representations. A debt will not be found nondischargeable when the debtor is not at fault.[9]

We conclude that the plaintiff has established a *prima facie* case that the bankrupts made materially false representations on which it detrimentally relied, thereby giving rise to a presumption that the bankrupts acted with intent to deceive. This presumption causes the burden of production (not the burden of persuasion) to shift to the bankrupts. Fed.R.Evid. 301.

Thus, the bankrupts must come forward with evidence to show that they had no intention of deceiving the creditor. As discussed above, the bankrupts have come forward with evidence to show their lack of intent to deceive, and therefore have effectively rebutted that presumption ("burst the bubble"). However, in the light of the plaintiff's evidence, none of the arguments presented by the bankrupts on the issue refute our conclusion that the false statements were made with intent to deceive. (See footnote 5 of this opinion.)

■ We conclude that the plaintiff has carried its burden of persuasion, having

---

9. For specific language used by the courts in this and other circuits in interpreting the § 17a(2) and § 14c(3) scienter requirements, *see*

*Third Circuit: In re McMillan,* 579 F.2d 289, 292 (3d Cir. 1978) (known falsehood, intent or purpose to deceive; actual fraud involving moral turpitude); *In re Weinroth,* 439 F.2d 787 (3d Cir. 1971) (knowingly or intentionally false or made carelessly and with reckless indifference to the actual facts); *see also In re Butler,* 407 F.2d 1059, 1061 (3d Cir. 1969), *aff'd,* 425 F.2d 47 (3d Cir. 1970); *In re Barbato,* 398 F.2d 572, 574 (3d Cir. 1968), *aff'd,* 421 F.2d 1324 (3d Cir. 1970); *In re Perlman,* 407 F.2d 861 (3d Cir. 1961);

*Eighth Circuit: Shainman v. Shears of Affton, Inc.,* 387 F.2d 33, 39–40 (8th Cir. 1967) (intentionally false);

*Ninth Circuit: In re Houtman,* 568 F.2d 651, 656 (9th Cir. 1978) (actual knowledge or reckless disregard); *Wright v. Lubinko,* 515 F.2d 260, 263–264 (9th Cir. 1975) (positive fraud or fraud in fact, involving moral turpitude or intentional wrong, fraudulent intent or reckless disregard for the truth tantamount to willful misrepresentation); *In re Taylor,* 514 F.2d 1370 (9th Cir. 1975) (intent to deceive);

*Tenth Circuit: Wolfe v. Tri-State Insurance Co.,* 407 F.2d 16, 19 (10th Cir. 1969) (intentionally false or intended to deceive); *see also American Nat'l Bank of Denver v. Rainguet,* 323 F.2d 881 (10th Cir. 1963).

shown by clear and convincing evidence that it reasonably relied to its detriment on the bankrupts' materially false statement in writing, which was made with intent to deceive.

There remain two questions that must be resolved: (1) Can Catherine Barrett be held liable for the submission of the false statement; and (2) Although plaintiff here has suffered damage as a result of refinancing the loan in reliance upon the false credit statement, should all or only a portion of the debt owed to the plaintiff be declared nondischargeable? In other words, what damage did the plaintiff suffer as the proximate result of having refinanced the loan?

First, Catherine Barrett did not herself fill out the credit statement; she testified that she relied on the honesty and accuracy of her husband's representations (N.T. at 52). However, she knew the purpose of the statement and that the list of creditors was expected to be a complete list. In fact, it was Mrs. Barrett who initially contacted the plaintiff for the purpose of seeking another loan. (N.T. at 48.)

A survey of the case law convinces us that a bankrupt, who with knowledge of the purpose of a credit statement in a loan application, signs the statement after his or her spouse completes it, is liable for the truth of the contents of that statement.[10]

For example, in *In re Berman*, 40 F.Supp. 242 (E.D.N.Y.1941), a bankrupt appealed from an order denying his discharge. (The complaint, alleging that a false financial statement had been made, was then based on § 14c(3).) The bankrupt claimed that he had merely signed and sworn to the accuracy of a financial statement filled out by his wife. The court affirmed the finding of nondischargeability:

The bankrupt herein signed the statement himself, and swore to it. He must be held to be responsible for the natural consequences of his acts. He is accountable for each and every fact contained in the statement he signed and cannot avoid these responsibilities by contending that his wife filled it in and therefore he is not liable for the acts of his agent.

40 F.Supp. at 243. Mrs. Barrett cannot claim that she is not liable for her husband's actions, because she signed the statement herself after having had an opportunity to read it. (N.T. at 34.)

The bankrupt in *David v. Annapolis Banking & Trust Co.*, 209 F.2d 343 (4th Cir. 1953), was a married woman. Her husband obtained a loan from the creditor-plaintiff, a bank, in her name. The bank insisted on a statement of the bankrupt's financial condition. The husband filled it out and had the bankrupt sign it. The statement "grossly misrepresented" the bankrupt's financial status. The bankrupt claimed that she was ignorant of the contents of the statement, but instead had relied on her husband to complete it accurately. The court affirmed the denial of discharge, reasoning:

Bankrupt must have known that her statement was to be used as a basis of credit, yet she made no effort to verify the facts stated and had no reasonable ground to believe that they were true. A wife who allows her husband to do business in her name and signs without question any sort of paper that he presents to her is not entitled to discharge in bankruptcy merely because she has relied upon him where she has signed a statement as to her financial condition with "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with

---

**10.** The evidence presented in Exhibits D–1 and D–2 shows that Catherine Barrett signed the credit statements of June 4, 1976 and April 26, 1977 in the space marked "Witness." However, on the loan application form itself (Exhibit D–3), it is indicated by appropriately checked boxes that Paul and Catherine Barrett were applying jointly for the loan and that jointly owned collateral was available to be used for

security. (N.T. at 20–21.) In addition, the note evidencing the loan, which Catherine signed (Exhibit D–4), lists both Paul and Catherine Barrett as "Borrowers." Hence, we think it clear that all of the parties involved intended that Catherine Barrett be bound by her signature, not only as to the truth of the credit statements, (N.T. at 18, 34), but also as to her own personal liability on the loan.

no other reasonable ground to believe that it was in fact correct". *See Morimura, Arai and Co. v. Taback*, 279 U.S. 24, 33, 49 S.Ct. 212, 73 L.Ed. 586 . . . [1929].

209 F.2d at 344.

■ Catherine Barrett did sign the credit statement in the case at bar. (*See* footnote 2, *supra.*) She did have an opportunity to read and examine it. She knew that it was to include a complete list of creditors and that it was to be relied upon by plaintiff in deciding whether to grant defendants a loan. The evidence overwhelmingly supports our conclusion that defendant Catherine Barrett shared in her husband's fraudulent intent, or, minimally, acted with "reckless indifference to the actual facts."

Second, we must consider whether the entire debt or only a portion thereof should be declared nondischargeable. This question is to be resolved by resort to federal law. *In re Meyers*, 1 BCD 1651, 1652 n. 4 (E.D.Mich.1975).

■ We find that only the "fresh cash" amount advanced to the bankrupts is nondischargeable. *In re Tapman*, Bankr. No. 74–3 (E.D.Pa. July 11, 1974); *In re Berry*, Bankr. No. 71–887 (E.D.Pa. March 12, 1973). "A clear majority of the federal courts that have addressed this issue have limited recovery to the amount of the fresh cash advanced." *In re Peterson*, 3 BCD 278, 279 (D.Minn.1979) (*see* cases cited therein). *See also In re Danns*, 588 F.2d 114 (2d Cir. 1977); *In re Allen*, 2 BCD 1043 (S.D.N.Y. 1976); *In re Meyers*, 1 BCD 1651 (E.D.Mich. 1975); and cases cited in Townsend, 31 *U.Miami L.Rev.* 275, 284 n. 53 (1977) [hereinafter cited as Townsend].

The above-cited cases set forth a number of reasons that support the conclusion that only the "fresh cash" portion should be nondischargeable. Some of those reasons are: (1) loan renewals which consolidate a prior loan with a "fresh cash" advance more often occur for the convenience of the loan company than at the request of the debtor; (2) the creditor's actual reliance, if any, on a false financial statement, under these circumstances, occurs only with respect to the "fresh cash" portion of the loan; (3) the bankrupt should be penalized only for the consequences of his fraud, which fraud resulted in his obtaining only the "fresh cash"; (4) the "fresh cash" advance is usually only a small portion of the entire refinanced debt; and (5) the fresh start philosophy of the Bankruptcy Act further indicates that the interpretation of the Act which makes nondischargeable only the smaller, "fresh cash" amount, better effectuates congressional intent.

We find that the particular restructuring of the loan to reflect the "fresh cash" advance occurred for the convenience of the finance company and not at the behest of the debtor.[11] Moreover, in advancing the "fresh cash" to the debtors, the finance company relied on the May, 1977 false statement of the debtors; it is that amount alone which was "obtained" as a result of the false statement.[12] Therefore, it is that amount alone which should and does constitute the actual loss suffered by the finance company as a result of the submission by the bankrupts of the false statement. *See* Townsend, *supra* at 284–286. Finally, we agree with those courts that have held that this construction of § 17a(2) best effectuates the fresh start policy of the Bankruptcy Act.

For all of the above reasons, we conclude that only the amount of the debt constitut-

---

**11.** The significance of this finding lies in the fact that had a second, separate loan been made instead of the refinancing which did occur, the plaintiff would be in no position to argue that the "fresh cash" advance should be considered in conjunction with (or that it "tainted") the earlier loan. It is apparent that the plaintiff chose this form of refinancing for its own purposes; it should not be permitted to take advantage of this circumstance.

**12.** We reiterate that the plaintiff has not carried its burden of proof as to any reliance by it on the June, 1976 financial statement made by the bankrupts, either in granting the original loan or its refinancing. Neither has plaintiff proved any case on the issues of materiality or intent of the bankrupts with respect to the June, 1976 statement.

ing "fresh cash" ($1,100), is nondischargeable.