**In the Matter of William Albert TAYLOR, aka William A. Taylor, Bankrupt.**

**PUBLIC FINANCE CORPORATION OF REDLANDS, Appellant,**

v.

**William A. TAYLOR, Appellee.**

**No. 73–2812.**

United States Court of Appeals, Ninth Circuit.

April 18, 1975.

---

4. See n. 3, supra.

Alvin O. Weiner, of Styskal, Wiese & Melchione, North Hollywood, Cal., for appellant.

Marshall Miles, San Bernadino, Cal., Dan L. Rankins, Wallace L. Taggart, of Rankins & Taggart, Bloomington, Cal., for appellee.

## OPINION

Before DUNIWAY and KILKENNY, Circuit Judges, and SOLOMON,* District Judge.

KILKENNY, Circuit Judge:

Appellant creditor filed an application to determine the dischargeability of a debt owed it by appellee bankrupt, claiming the debt to have been fraudulently obtained under § 17(a)(2) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2). The bankruptcy referee found for appellee. Appellant petitioned for review, the district court sustained the referee's·

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

findings and conclusions, and this appeal follows. We affirm.

## FACTS

Appellee entered appellant's office in October, 1971, and applied for a consolidation loan in excess of $3,000.00. He had previously obtained credit from appellant in August, 1970, and July, 1971. Appellee was asked by appellant's agent to complete a form entitled "Statement for Purpose of Obtaining a Loan or Extension of Credit." The form required a listing of the applicant's other creditors, the nature of the other debts, and the amounts owed.

At the time of his loan application, appellee owed over $23,000.00 to other creditors, consisting, in part, of $13,000.00 owing on a real property deed of trust. Appellee listed none of these debts on the statement. A significant factual dispute exists concerning what appellee was told by appellant's agent to include on the form and the manner, if at all, in which appellee was led to respond.

Appellee testified that he informed appellant's agent about the second mortgage on his home in Pico Rivera and included only the home in Fontana because the agent told him, "Put your house that you're living in now, because that's the debt you owe, anyway." Appellee said he did not enter the Pico Rivera debt and two smaller bills ". . . because he [appellant's agent] said I didn't need them on there."

As a precondition to extending the credit, appellant obtained a security interest in the household furniture at his Fontana home. However, appellee failed to disclose, orally or otherwise, that he had given AVCO Financial Services an identical security interest a month earlier. Appellee said he believed appellant would find the AVCO transaction and the other debts in their own records since they had been dealing with him for a period of years. He denied any intention of hiding any debts from appellant.

The record shows that appellant did not rely entirely on the appellee's statements or the written documents. It reveals that appellant ran a credit clearance exchange search on appellee, but evidently used the wrong exchange. This supports appellee's claim that he thought their own records and inquiries would disclose the AVCO transaction. Appellant's representative did not deny appellee's testimony that he did not list the Pico Rivera debt and other small bills because the representative told him that he did not need to. The representative just did not recall any conversation that he might have had with appellee with reference to other debts. Beyond that, appellee testified that appellant knew that ". . . I had a loan with AVCO before. It was on their listing there."

Appellant's witnesses testified that appellee's loan would never have been granted had he fully disclosed his liabilities, especially with regard to the AVCO security interest. In addition, appellant contended that it had no other way of knowing of appellee's AVCO debt due to its being listed on an area credit clearance exchange different from their own.

After a full evidentiary hearing, the referee found that the evidence did not sustain appellant's burden of proving that appellee intended to deceive appellant in obtaining the loan. Accordingly, the debt to appellant was ordered discharged.

## ISSUES ON APPEAL

I. Did the referee apply to the evidence the proper burden of proof?

II. Did the referee err in finding that appellant failed to sustain its burden of proof?

### I.

Section 17(a) of the Bankruptcy Act, 11 U.S.C. § 35(a), lists certain debts not affected by a discharge, including "(2) . . . liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money

or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his [bankrupt's] financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive . . . ."

[1, 2] This section has traditionally been subject to the same rule of strict, literal construction governing all other exceptions to the Bankruptcy Act. Gleason v. Thaw, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Courts have consistently held that in order for § 17(a)(2) to bar a discharge, the party alleging fraud must prove actual or positive fraud, not merely fraud implied by law. In re Dolnick, 374 F.Supp. 84, 90 (N.D. Ill.1974); In re Adams, 368 F.Supp. 80 (D.S.D.1973); United States v. Syros, 254 F.Supp. 195, 198 (E.D.Mo.1966); 1A Collier on Bankruptcy § 17.16(3).[1] This fraud is the type involving moral turpitude or intentional wrong, and thus there can be no mere imputation of bad faith. According to Sweet v. Ritter Finance Co., 263 F.Supp. 540, 543 (W.D.Va. 1967), the objecting party's burden of proof consists of five elements:

". . . (1) the debtor made the representations; (2) that at the time he knew they were false; (3) *that he made them with the intention and purpose of deceiving the creditor*; (4) that the creditor relied on such representations, and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made." [Emphasis supplied.]

While these authorities are not controlling, they are persuasive and, in our opinion, properly construe Section 17(a)(2) of the Bankruptcy Act, 11 U.S.C. § 35(a)(2).

Cases such as Morimura, Arai & Co. v. Taback, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929), on which appellant relies, construe former § 14(b) of the Bankruptcy Act, rather than § 17(a)(2), which is before us. Beyond that, the Master in *Taback* made no findings of fact, a failure which the Supreme Court recognized and then went on to make its own examination of the facts. We add that the "clearly erroneous" rule was not in effect at the time of the *Taback* decision. Other cases cited by appellant are no more in point.

■ Accordingly, we hold the burden of proof was on appellant to show that appellee intentionally and purposefully attempted to deceive appellant in obtaining the loan. Although a few cases suggest that the burden of proof changes when a *prima facie* case of falsity has been presented, the true rule is that while the burden of going forward may change, the burden of proof does not. Here, the appellee took the witness stand and obviously persuaded the referee of a lack of intent.

## II.

■ Even assuming that appellee's statements, the other testimony and exhibits present some evidence of fraudulent intent, nonetheless, we are subject to the "clearly erroneous" requirement of Rule 52(a), FRCivP. As in other civil matters, a bankruptcy referee's findings of fact are to be upheld unless they are clearly erroneous. Coen v. Zick, 458 F.2d 326, 328 (CA9 1972); Kentile Floors, Inc. v. Winham, 440 F.2d 1128 (CA9 1971). The question of intent to deceive is particularly one of fact, and so the bankrupt's credibility is an important factor. In re Ostrer, 393 F.2d 646 (CA2 1968);[2] Becker v. Shields, 237 F.2d 622, 625 (CA8 1956). Here, the referee's findings must be accorded great weight because he had

---

1. State courts are in agreement, *e. g.*, General Finance Loan Co. of Downtown Shreveport v. Allen, 165 So.2d 20 (La.App.1964); Friendly Finance Co. v. Stover, 109 Ga.App. 21, 134 S.E.2d 837 (Ga.App.1964); Zerega Distributing

Co. v. Gough, 52 Wash.2d 443, 325 P.2d 894 (1958).

2. Construing § 14c(3) of the Bankruptcy Act, 11 U.S.C. § 32(c)(3).

an opportunity to hear and observe the demeanor of the bankrupt and the other witnesses. Miguel v. Walsh, 447 F.2d 724, 726 (CA9 1971); Greenfield State Bank v. Copeland, 330 F.2d 767, 769 (CA9 1964).[3]

Our colleague's dissent is grounded principally on selected language taken from United States v. United States Gypsum Co., 333 U.S. 364, 385–396, 68 S.Ct. 525, 92 L.Ed. 746 (1948), one of the classic cases on the "clearly erroneous" rule, which he says should be applied to our facts. Here, as distinguished from *United States Gypsum*, we are governed by a special statute which places squarely on the shoulders of the objecting creditor the burden of proof in establishing the bankrupt's intent to defraud. The language used in the decision, emphasized in the dissent, must be read in the light of this controlling statute as construed in the cases cited in Part I of this opinion. In *United States Gypsum*, the Court held that ". . . proof of an express understanding that each party would sign the agreements was not a 'prerequisite to an unlawful conspiracy'." *Id.* at 394, 68 S.Ct. at 541. Beyond that, the Court held that in an antitrust case, ". . . a strong inference arises that such agreements [a series of separate, but similar, agreements with competitors] are the result of concerted action." *Id.* Needless to say, there is no such presumption or inference in favor of appellant in the instant case. Here, the presumption under the statute favors appellee. Consequently, *United States Gypsum* does not fit our facts.

█ Beyond that, our colleague's own exhaustive majority opinion in Lundgren v. Freeman, 307 F.2d 104, 113–115 (CA9 1962), makes it clear that Rule 52(a) controls, even though the finding is based on documentary evidence or undisputed facts, when different inferences may be drawn from the evidence. Recent cases following the *Lundgren* rule are Transducer Patents Co. v. Renegotiation Board, 492 F.2d 247, 250 (CA9 1974), and

United States v. Alaska S.S. Co., 491 F.2d 1147, 1151 (CA9 1974). Inasmuch as we believe that different inferences can be drawn from the entire record, some of which are favorable to appellee on the issue of intent, we hold that the referee's findings are not clearly erroneous.

The judgment of the district court is affirmed.

DUNIWAY, Circuit Judge (concurring and dissenting):

I concur in part I of Judge Kilkenny's opinion, dealing with the burden of proof. However, I cannot agree with part II, which holds that the referee's findings are not clearly erroneous. In my opinion, those findings are clearly erroneous.

In the leading case of United States v. United States Gypsum Co., 1948, 333 U.S. 364 at 395–6, 68 S.Ct. 525 at 542, the Court said this about the "clearly erroneous" rule (Rule 52(a), F.R.Civ.P.):

> Since judicial review of findings of trial courts does not have the statutory or constitutional limitations on judicial review of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where "clearly erroneous." The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

The government relied very largely on documentary exhibits, and called as witnesses many of the authors of the documents. Both on direct and cross-examination counsel were permitted to

---

**3.** For purposes of factual similarity to the instant case, *see* In re Adams, *supra*.

phrase their questions in extremely leading form, so that the import of the witnesses' testimony was conflicting. On cross-examination most of the witnesses denied that they had acted in concert in securing patent licenses or that they had agreed to do the things which in fact were done. Where such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact. Despite the opportunity of the trial court to appraise the credibility of the witnesses, we cannot under the circumstances of this case rule otherwise than that Finding 118 is clearly erroneous. (Footnotes omitted)

In the case at bar, Taylor, in obtaining a renewal and increase of a loan from Public Finance, signed a statement, Exhibit 5, on October 7, 1971, entitled, in heavy block capital letters:

STATEMENT FOR PURPOSE OF OBTAINING A LOAN OR EXTENSION OF CREDIT

The statement recites:

For the specific purpose of obtaining a loan or credit from: PUBLIC FINANCE CORPORATION I hereby make the following statement as to my income and liabilities.

The only persons or companies to whom I owe money and their names and amounts of each indebtedness are as follows: . . . BE CERTAIN TO INCLUDE ALL DEBTS.

There follow spaces for listing indebtedness, in which Taylor listed five, totalling $3,892.00. Immediately above Taylor's signature there appears the following:

I certify no one has suggested that I omit any of my indebtedness from this statement.

Notwithstanding any previous dealing had with you or the value of any property mortgaged, I UNDERSTAND THAT IN MAKING THIS LOAN YOU ARE RELYING ON MY FINANCIAL CONDITION AS SHOWN BY ME IN THIS STATEMENT.

There is no claim that Taylor had not read the statement, nor could there be. He had filled out and signed two previous ones, on August 18, 1970 and July 23, 1971. To secure the October 1971 extension of credit and additional loan, Taylor also signed a "Security Agreement" giving Public Finance a lien on his household furniture, which was listed in detail in the agreement.

As Judge Kilkenny's opinion shows, Taylor had an explanation for the omission from the statement of certain of his debts. But he had no explanation for failing to list his $1,502.13 debt to AVCO Financial Services, which he had contracted a month before, and to secure which he had given AVCO a lien on the same furniture that he tendered to Public to secure his new indebtedness to Public. Here is what Taylor said about that, in describing his conversation with Chaffino, the officer of Public with whom he dealt:

Q. Did you indicate this other bill that you had to AVCO?

A. No, I did not that one, no, sir.

. . . . .

Q. Mr. Taylor, that is the same furniture that you gave the security interest to AVCO, correct?

A. AVCO didn't come over and check the furniture. They just put the furniture down on the listing.

Q. You did not sign a security agreement?

A. This is true, but AVCO never checked anything.

Q. Why didn't you tell Public of the AVCO loan?

A. I don't know. I felt they—He could check through and see my credit and see how many people I owed. If I owed that much money, he couldn't give it to me in the first place.

Q. You thought, then, that if you told him of AVCO, you wouldn't be able to consolidate your loans?

A. I told him about the house in Pico Rivera.

Q. I didn't ask about the house in Pico Rivera. I asked about the AVCO loan.

A. Because they know I had a loan with them before.

Q. Public knew?

A. Public knew I had a loan with AVCO before. It was on their listing there.

Q. You didn't forget about the AVCO loan when you made the loan?

A. No. I just didn't enter it, was all.

. . . . . .

Q. When did you say that you told Public of the AVCO loan?

A. I didn't tell them nothing about AVCO.

Q. I thought you—

A. I told them on a previous loan. It should be on there where I had the loan from AVCO before. It was Seaboard at this time, but they changed to AVCO.

Q. You had your other loan with AVCO that was renewed in September of 1971; right?

A. That's right.

Q. Okay. And you had at that time an existing loan with AVCO that was renewed at the time before that; correct? At AVCO and Seaboard; isn't that right?

A. AVCO was Seaboard, yes.

Q. It was the same thing, and you're saying that you told Public of that loan?

A. No, I didn't tell Public of that loan. Not the last loan, no. They should have it on the record that I made a loan from Seaboard because I had been doing business with Seaboard, too.

Q. You told them previously?

A. I told them back a year ago. I don't know how long it was.

Taylor then admitted that his first loan with Public was in August, 1970. This directly contradicts his earlier statement, in response to a leading question by his own counsel, that he had done business with Public for ten years. He identified the August 18, 1970 and July 23, 1971 statements. Neither mentions either AVCO or Seaboard.

Giving as much weight to the referee's opportunity to weigh Taylor's credibility as I can, I cannot accept his finding "[t]hat the evidence does not sustain the burden of proving the bankrupt intended to deceive Public Finance." As Taylor said about the AVCO loan, "If I owed that much money, he [Chaffino] couldn't give it to me in the first place." That is the only conceivable explanation for Taylor's omission of the AVCO loan. It is direct and conclusive evidence of his intent to deceive. It makes a complete mockery of his general statement that he had no intention of hiding any bills that he owed when he went in and talked to Chaffino. In the face of the written record and of Taylor's own admission, that general statement, at least as it relates to the indebtedness to AVCO, is obviously a bald faced lie.

Obvious false swearing cannot sustain a finding. Chaffino's testimony that, if he had known of the AVCO loan, he couldn't have made the loan to Taylor, stands uncontradicted in this record. It is corroborated by Taylor himself. The *United States Gypsum* case is directly in point. I cannot agree that this court should approve so obvious a fraud as there is here because of the "clearly erroneous" rule. That rule permits us to reverse for clear error; it does not require us to sustain such error.

I would reverse.