In the Matter of Harry Lee KIRCHER and Rosealee Kircher, Bankrupts.

The FARMERS TRUST COMPANY OF LEE'S SUMMIT, Plaintiff,

v.

Harry Lee KIRCHER and Rosealee Kircher, Defendants.

Bankruptcy Nos. 76B–1754–W–4, 76B–1755–W–4.

United States Bankruptcy Court, W. D. Missouri, W. D.

Feb. 23, 1981.

Michael C. McCormick, Lee's Summit, Mo., for plaintiff.

Ronald S. Weiss, Kansas City, Mo., for defendants.

1. The plaintiff also contended that the defendants' general discharge in bankruptcy should be denied.

## FINAL DECREE AND JUDGMENT DECLARING DEFENDANTS' INDEBTEDNESS TO PLAINTIFF TO BE DISCHARGEABLE IN BANKRUPTCY

DENNIS J. STEWART, Bankruptcy Judge.

These bankruptcy proceedings were reassigned from the docket of the late Jack C. Jones, Bankruptcy Judge, to the undersigned judge on November 1, 1979, by order of the Honorable Frank P. Barker, Jr., Chief Bankruptcy Judge. This court entered an order on December 3, 1979, "directing parties to show cause in writing within 15 days why the undersigned transferee judge should not render decision based on hearing before transferor judge or else consent in writing to his doing so." The parties then filed their written consents to a decision based on the February 22, 1979, hearing before the late Judge Jones.

The controversy itself began on February 10, 1977, when the plaintiff filed a "complaint to determine dischargeability of bankrupt." An amended complaint was subsequently filed on December 21, 1978. Basically, the plaintiff asserted that the defendants' indebtedness to it was nondischargeable under § 17(a)(2) of the Bankruptcy Act because the defendants (1) were guilty of "obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting [their] financial condition made ... with intent to deceive"; (2) were guilty of the "willful and malicious conversion of the property of another"; and (3) "failed to explain satisfactorily any losses of assets or deficiency of assets to meet [their] liabilities." [1]

The files and records in this case reveal that a series of loan transactions took place between the plaintiff and the defendants in which Harry Lee Kircher was the borrower and Rosealee Kircher was the guarantor. The following is a summary of those trans-

272

actions: (1) Sometime during 1971 the defendants borrowed $3,000.00 from the plaintiff. This loan was unsecured. (2) Sometime during 1972 the defendants borrowed an additional $2,000.00 from the plaintiff. This loan was secured by certain livestock. (3) On May 2, 1973, the defendants borrowed $8,000.00 from the plaintiff. Five thousand dollars of this amount was used to pay off the 1971 and 1972 notes. The remaining $3,000.00 was new money. This loan also was secured by livestock. (4) On December 7, 1974, the defendants borrowed an additional $2,000.00, bringing their total obligation up to $10,000.00. At this time the defendants submitted a financial statement in which they listed $316,650.00 in assets and $8,000.00 in liabilities for a net worth of $308,650.00. See Plaintiff's Exhibit No. 3. Fifty-four Holstein heifers and 1 Holstein bull secured the loan. (5) Finally, on August 8, 1975, Harry Lee Kircher executed a new promissory note in the principal sum of $10,270.00 and a new security agreement granting plaintiff a security interest in "54 Holstein Heifers with Natural Increase Average We. 1200 lbs." and in "1 Holstein Bull We. 1250 lbs." See Plaintiff's Exhibit No. 1. As with the earlier notes, Rosealee Kircher served as guarantor of this note pursuant to the terms and conditions of the guaranty executed on August 9, 1971. See Exhibit B attached to the complaint. There is no dispute that the defendants owe the plaintiff $9,102.32 plus accrued interest on the August 8, 1975, note.

On April 28, 1980, the court entered an order directing the parties to show cause in writing why a proposed judgment attached thereto should not be filed as the findings of fact, conclusions of law and judgment in this case. This was done "[i]n order to ensure that the facts found [we]re not based upon a wholly erroneous view of the evidence which was submitted to the prior judge." At that time the court did not have a transcript of the February 22, 1979, hearing. After receiving many continuances between them, the parties finally responded to that order. Included in the plaintiff's October 10, 1980, response was a certified copy of the transcript of the hearing.

■ First, the court will address the plaintiff's contention that the defendants obtained "an extension or renewal of credit in reliance upon a materially false statement in writing respecting [their] financial condition made or published . . . with intent to deceive." Section 17(a)(2) of the Bankruptcy Act. The burden is on the party objecting to the discharge of a particular debt to prove the facts essential to nondischargeability. "Courts have consistently held that in order for § 17(a)(2) to bar a discharge, the party alleging fraud must prove actual or positive fraud, not merely fraud implied by law." *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir. 1975). This means that the plaintiff herein had to show that: " '(1) the debtor made the representations; (2) that at the time he knew they were false; (3) *that he made them with the intention and purpose of deceiving the creditor*; (4) that the creditor relied on such representations, and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.' " *Id.*, quoting from *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967). However, once the creditor "meets the initial burden of producing evidence which establishes that a materially false statement was made and that credit was obtained thereby, the burden of showing lack of intent to deceive will be upon the bankrupt." 1A Collier on Bankruptcy ¶ 14.43 at p. 1407 (14th ed. 1977). The files and records herein reveal that Mr. Kircher made two written statements regarding his financial condition. Both were originally made in connection with the December 7, 1974, transaction. The first of these statements which the court will discuss is the financial statement in which Mr. Kircher showed his net worth to be $308,650.00.

■ One of the assets listed therein was 307 acres of land with a present value, at the time, of $250,000.00. The evidence clearly shows that Mr. Kircher did not own that land. It was owned by Mr. Kircher's

parents. The defendants only lived on it and farmed it. Thus, the transcript of the hearing conducted by Judge Jones reflects the following testimony at pp. 35–36 by the defendant Mr. Kircher:

"Q. [By Mr. McCormick] Now, let me refer you to a portion in the upper left-hand corner of the front page of Plaintiff's Exhibit No. 3, a portion of it or a title called 'Farmlands per schedule,' and this is under what is also titled 'Resources.' You've listed there a farm valued at $250,-000, is that correct?

A. Yeah.

Q. And down further on this same page under what is titled 'Schedule of Real Estate,' you have also listed this $250,000 farm, is that correct?

A. Yeah.

Q. And you've stated that no encumbrances whatsoever were on that piece of farm land.

A. Right.

Q. And the name that you list the farm as being recorded under is Harry Kircher, is that correct?

A. Yes.

Q. And your name is Harry Kircher?

A. (Nods head.)

Q. Now, who is that farm actually owned by?

A. Owned by my father and mother.

Q. Have you ever had title to it yourself?

A. No."

The financial statement was applicable to the August 8, 1975, transaction as well. That statement reads in pertinent part that:

"I agree to and will notify you immediately in writing of any materially unfavorable change in my financial condition, and in the absence of such notice or of a new and full written statement, this may be considered as a continuing statement and substantially correct. It is hereby expressly agreed that upon application for further credit, this statement shall have the same force and effect as it was delivered as an original statement of my financial condition at the time such further credit is requested." See Plaintiff's Exhibit No. 3.

The other written statement which Mr. Kircher made regarding his financial condition was the security agreement in which he pledged 54 Holstein heifers and 1 Holstein bull as collateral for the August 8, 1975, loan. The defendants have argued that this was prepared for the December 4, 1974, loan and, as such, the "information was merely transferred to the August 8, 1975 security agreement." Defendants' April 5, 1979, "Suggestions and Authorities in Opposition to Plaintiff's Brief" at page 4. This argument is not persuasive. The defendant signed the August 8, 1975, security agreement and, as such, was responsible for its contents. The record indicates that Mr. Kircher did not have possession of those cattle at that time. His testimony in the hearing conducted by Judge Jones is to the following effect at pp. 32–34 of the transcript:

"Q. [By Mr. McCormick] And you listed on each of those occasions on the new notes these cattle that came out of Wisconsin were listed as security for the note?

The Court: Wouldn't be on the note would it? Would be on the security agreement.

Mr. McCormick: Yes. I am sorry. I said security for the note.

Q. (By Mr. McCormick) Is that correct?

A. Yes.

Q. On each of those renewal dates then you pledged these cattle as security for the note?

A. Yeah.

Q. But in fact, those cattle died on May and June of '73?

A. Yeah.

Q. Now—

Mr. Weiss: Well, Your Honor, I'm going to object. I think the security agreement is in evidence and speaks for itself as to what was pledged.

Mr. McCormick: Your Honor—

The Court: It does. But he's saying that they died in May and June of '73 and ever since '73 and up to and including now we have been carrying the cattle on the note and security agreement and it's also on '75.

Mr. Weiss: Well, my point is that the security, that the wording of the security agreement, I believe, is that all cattle are pledged as collateral.

The Court: That's the financing statement.

Mr. Weiss: Or the financing statement, rather.

The Court: Right. But the security agreement, I think, says 54—well, let's don't guess. Let's see what it does say. Fifty-four Holstein heifers, natural increase; average weight 1200 pounds. One Holstein bull. Is what the security agreement says.

Q. (By Mr. McCormick) As a matter of fact, those 54 Holsteins, at least 45 to 47 of those Holsteins died in May and June of '73?

A. Yes, sir."

Moreover, at page 44 of the transcript of the hearing before Judge Jones, Mr. Kircher testified to the following effect:

"Q. [By Mr. McCormick] So you are saying that all but five of the bank's cows died?

A. As calves, right.

Q. In May or June of '73?

A. Yes.

Q. And then subsequent to that you reexecuted various notes and borrowed a little more money?

A. Yes."

The foregoing demonstrates that Mr. Kircher made the fraudulent representations and that at the time he must have known they were false. The next question, then, is whether he "made them with the intention and the purpose of deceiving" the bank. The record shows that he did, at least in regards to the 307 acres of land. See his testimony to the following effect at page 38 of the transcript of the hearing conducted by Judge Jones:

"Q. [By Mr. Weiss] Now, concerning this land that is titled in your mother's name that you are living on, and farming, could you tell us the reason that you indicated on the financial statement that you were the owner of that?

A. Well, me and my mother got a verbal agreement that I want to buy the place if I ever financially get able to and *I knew it would help me get the loan*." (Emphasis added.)

Thus, the pivotal question is whether the plaintiff relied on Mr. Kircher's representations. The fact that the plaintiff requested collateral and a financial statement may warrant an inference that it relied upon them when it made the loans. Cf. *Gardner v. American Century Mortgage Investors*, 577 F.2d 928, 929 (5th Cir. 1978). ("The creditors had requested these statements before approving the loans and agents for the creditors testified that these statements had been considered in granting the loans.") However, it is the court's opinion that the plaintiff failed to show any such material reliance. A representative of the plaintiff testified at the hearing as follows:

"Q. (By Mrs. Weiss) Could you tell me what process the Loan Approval Committee or the committee that you just referred to, went through in approving this transaction?

A. In approving the rewriting of it?

Q. Yes.

A. We'd already had the loan on our books.

Q. Right.

A. It came due on June the 25th. The Kirchers came in on the 8th of August and the loan was past due from its due date. They didn't have the funds to pay the interest so we added that to the face of the note. In other words, we already had the loan on our books at that time and they could not come up with the interest at that time but they did

agree that they had a dairy operation and had monthly income coming in from the sale of milk and could reduce it on a monthly basis and that was the reason we converted it to a term note, a 180–day note to a scheduled monthly reduction on it.

Q. All right. So based upon the fact that they were operating a dairy operation out there and that they were behind and didn't have the money you entered into the August 8, 1975 transaction?

A. That's correct.

Q. Was there anything else that went into your decision other than what I've just stated?

A. Well, sure, the terms changed considerably from having no reduction to a monthly reduction. This was a way we could foresee of the loan being paid without them selling the cattle.

Q. And that's the reason you entered into that?

A. And that's the reason we entered into this agreement.

Q. Now, at the time that you did this in August of 1975 you didn't have a—you didn't ask them to present you with a new financial statement, did you?

A. We don't have one in file. Now—if we had one I don't know about it.

Q. Referring to Plaintiff's Exhibit No. 3, which is a financial statement signed only by Mr. Kircher, dated December 3, 1974, that's the last financial statement that you had prior to making the loan, isn't it?

A. That's correct. We try to get one a year and this would—at the time this was transferred or rewritten this statement was not a year old.

Q. But in any event you did not require any type of new financial statement on August 8, 1975?

A. No, we did not. To my knowledge.

Q. Do you have any policy—does the bank have any policy requiring that a financial statement be—

A. Annually.

Q. —be presented—

A. Annually.

Q. —at the time a loan is made or an extension is granted?

A. No. We try to get one annually, but as far as using that as a crutch in renewing a note we don't do that."

Tr. 23, 24, 25, and 26.

This testimony evinces a lack of reliance upon the financial statement. In addition, the previous conduct of the parties indicates a lack of material reliance on it. As previously noted, the bankrupts' total indebtedness to the plaintiff had reached $8,000.00 by May 2, 1973. Yet, the bank was not furnished with a financial statement until shortly before the December 7, 1974, transaction; and, as can be inferred from the testimony of the bank's representative, there would not have been any material reliance upon it at that time. Furthermore, there is no evidence that the contents of the financial statement were checked for their veracity. An inquiry at the county recorder's office would have revealed that the major asset listed in the financial statement was not owned by the bankrupts.

The files and records herein suggest the possibility that the reliance was upon the cattle. However, it is the court's opinion that the evidence does not establish any material reliance on the cattle. The evidence does not suggest that the bank ever obtained a physical count or inspection of the cattle, not even when it first took a security interest in them. Mr. Kircher's testimony, *supra*, at pp. 6 and 7 herein, was that 45 to 47 of the cattle died in May or June of 1973. See pp. 13–16 of the transcript to the following effect:

"Q. [By Mr. McCormick] Now, on May 2nd, 1973, you say an additional amount was loaned to the Kircher's?

A. Uh-huh.

Q. And at that time the Farmers Trust Company took a security interest?

A. On the livestock.

\* \* \* \* \* \*

Q. (By Mr. McCormick) Mr. Burns, does Plaintiff's Exhibit No. 2 reflect the security interest that was taken by the bank on or about the May 2nd loan?

A. That's correct. That was the reason we filed the financing statement because we put the cattle on for security at that time.

\* \* \* \* \* \*

Q. Now, when you first became involved with the Kirchers did you have occasion to go out to their farm and take a look at the cattle?

A. I went out around the time that this note was put on our books. [The August 8, 1975, note.]

Q. Sometime before or after that date?

A. I think it was—I would say around it. I can't tell you whether it was before or after. Within a 10 day period.

Q. What did you observe out there with relation to the cattle?

A. We looked at some cattle out there. We had problems getting a head count because we had on our security agreement 54 head and we never actually could find 54 head.

\* \* \* \* \* \*

The Witness: That was the first time. I had gone out several times since then until we went out to pick the five head, remaining head, up."

Because the court has not found material reliance on the defendant's representations, it is unnecessary to address the question of whether the bank "sustained the alleged loss and damage as the proximate result of the representations having been made." *In re Taylor, supra.*

■ As noted earlier, the plaintiff's amended complaint also alleged that the defendants' indebtedness to it was nondischargeable under § 17(a)(2) because the defendants were guilty of the "willful and malicious conversion of the property of an-

other." It appears from the files and records herein that neither party addressed this issue at trial or in any of their briefs. Under Missouri law, a conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Breece v. Jett,* 556 S.W.2d 696, 709 (Mo.App.1977). The files and records do not reveal any evidence which would support a finding of conversion. The fact that the cattle in which the plaintiff had a security interest died is not sufficient to show that the defendants *intentionally* interfered with the rights of the plaintiff in the cattle.

■ In addition, the plaintiff alleged that § 14(c)(7) of the Bankruptcy Act barred the defendants' discharge because they failed to explain satisfactorily the loss of assets or deficiency of assets to meet their liabilities. "It is not sufficient for the creditor to allege this objection in the words of the Act." 1A Collier on Bankruptcy ¶ 14.60 at 1435 (14th ed. 1977). The burden is on the plaintiff to plead that "the bankrupt was called upon to explain losses of assets or deficiency of assets to meet his liabilities and that he failed to do so or failed to do so 'satisfactorily.'" *Id.,* at 1436. It does not appear from the files and records herein that the plaintiff ever called upon the defendants to explain the loss or deficiency of assets even though there appear to have been plenty of opportunities to do so. See the testimony of the witness James P. Burns at pages 20 and 27 of the transcript to the following effect:

"Q. [By Mr. McCormick] During your visits out there, let's see, it would have taken place over the course of a little more than a year, I take it from what you said, how many times do you think you were out there?

A. I would say a half a dozen, six times, in that period of a year, either to try to get a payment or to visit with them about—

Q. Were you ever informed that all of the cows were present; all of the cows that were pledged as security for the note?

A. No.

Q. Did they ever state to you that any of the cows were missing in any fashion?

A. Not to my knowledge.

\* \* \* \* \* \*

Q. [By Mr. Weiss] Did you ever go out to—when you were out to the Kircher's place, did you ever go out with Mr. Kircher or Mrs. Kircher, out to the field and count the cattle?

A. We tried to do that several times. We may have gone one time with the Kirchers, but we never could get a full head count. It was really kind of evasive.

Q. They didn't stop you from going out there counting them did they?

A. No.

Q. Did you ever ask them if any of the cows—they had sold any of the cows?

A. I personally didn't. I don't know if—

Q. I am just interested in what you did.

A. No.

Q. Did you ever ask them if any of them died?

A. No."

Because no specific facts were adduced to support that contention, the court cannot bar the defendants' discharge on the basis of § 14(c)(7).

■ The plaintiff did not plead the issue of a § 14(c)(3) bar to the defendants' discharge, however, it raised that issue in its brief and suggestions filed herein on March 12, 1979. Section 14(c)(3) pertinently provides that a bankrupt's discharge may be barred if:

"while [he was] engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation."

A § 14(c)(3) bar to discharge does not apply to all cases in which a false written financial statement was given. "It should be confined to cases where the decision to give credit was induced by the false statement, which must have been, if not the moving cause behind the giving, extending or renewal or credit, a contributing cause, i. e.: the lender or seller must to an extent at least have relied upon it." 1A Collier on Bankruptcy ¶ 14.39 at 1388. As discussed earlier, the court did not find any material reliance by the plaintiff on the defendants' financial statement. In addition, "[t]he court may not accept a cause asserted under Section 14 given by way of argument in a memorandum of law as to which the bankrupt received no notice, could not interpose a pleading, and no evidence was adduced by plaintiff." *In the Matter of Willis H. Burgett, III,* 2 BCD 616, 617 (S.D.N.Y.1976). It is therefore, for the foregoing reasons,

ORDERED, ADJUDGED AND DECREED that the indebtedness of Harry Lee Kircher and Rosealee Kircher to The Farmers Trust Company of Lee's Summit in the sum of $8,105.59 be, and it is hereby, discharged in bankruptcy.[2]

---

2. Because the debt was found to be dischargeable in bankruptcy, the court was not called upon to determine Mrs. Kircher's liability as guarantor of the loan. However, no evidence was adduced which demonstrated that Mrs. Kircher was guilty of any misconduct in her dealings with the plaintiff as the guarantor of her husband's loans. Nor does it appear that the defendant Harry Lee Kircher was acting as the agent of Rosealee Kircher within the scope of his authority as agent.