**In re Barrie E. SMITH Color Processors, Inc. a/k/a CPI, Debtors.**

**Patricia Marie Smith PETTIGREW, Plaintiff,**

**v.**

**Barrie E. SMITH Color Processors, Inc. a/k/a CPI, Defendants.**

**Bankruptcy Nos. 285–00403, 285–00404. Adv. No. 286/0001.**

United States Bankruptcy Court, D. Montana.

May 21, 1986.

Charles J. Tornabene, Missoula, Mont., for debtors.

William R. Baldassin, Missoula, Mont., for plaintiff.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 21st day of May, 1986.

The Plaintiff brought this adversary proceeding against the Debtors seeking to declare her debt non-dischargeable under Section 523 of the Bankruptcy Code. After trial of the cause and submission of proposed Findings of Fact and Conclusions of Law, the Plaintiff has conceded that she has no enforceable claim against Color Processors, Inc. (CPI, Inc.), a corporation. Thus, the matter is to be decided against the individual Debtor Barrie E. Smith.

Pettigrew and the Debtor are former husband and wife, having been divorced on June 10, 1976. In the divorce proceeding,

the parties entered into a "Marital and Property Settlement Agreement". The state court granted the care, custody and control of the parties' minor child to Pettigrew, and specifically awarded her $125.00 per month as child support, but provided "that said child support shall be waived by the petitioner as long as she receives the salary from the corporation owned by the parties, and said support shall commence the first day of the month subsequent to the sale of the corporation or termination of her wages". After the child reached the age of 10 years, the support was to increase to $150.00 per month. The state decree incorporates by reference the Marital and Property Settlement Agreement. That agreement contains several provisions dealing with custody, child support, medical and dental care for the child, exemptions for federal and state income tax purposes and property distribution. Under the property distribution clause it was agreed and recited:

"The parties are the sole holders of all outstanding stock in CPI, Inc., a Montana corporation, consisting of a photo processing plant, a commercial business. The corporation shall be immediately sold, and listed for a price of one million two hundred fifty thousand dollars ($1,250,000.00). Upon the acceptance by both parties of an offer to purchase said business, all indebtedness shall be immediately paid owing (sic) against the business, specifically included but not limited to all debts owed to the parents of the wife.

The husband shall be responsible for the negotiation of this sale, and in the event if the same is not completed within a period of six (6) months from the date of the execution of this agreement, the parties will then agree to enter into a written agreement as to the further elements of negotiation of sale and the purchase price.

Each of the parties has received a salary in the amount of two thousand three hundred dollars ($2,300.00) per month from the corporation as result of their

mutual operation of the corporation. The wife shall continue to receive that salary until such time as the business is sold. The husband shall in addition to his salary receive a wage increase in the amount of not less than fifteen (15) per cent ·but not more than twenty (20) per cent until such time as the business is sold."

The business was not sold, but the corporation continued payments to Pettigrew, many times in excess of the $2,300.00 monthly payment, so that by October 30, 1981, Pettigrew had received payments totaling $232,602.88, plus payments for miscellaneous items. On October 30, 1981, the parties entered into a second agreement dealing with the sale of Pettigrew's stock in the corporation. She transferred 1,610 shares of stock to Smith, the Debtor, for an agreed price of $220,000.00. By the time the Debtor filed his bankruptcy petition, Pettigrew had been paid $136,500.00 plus a Lincoln automobile under the stock purchase agreement. Such agreement also provided that Smith, as president and sole stockholder of Color Processors, Inc., agrees to grant Pettigrew "a security interest in the equipment and furniture now owned or hereafter acquired by Color Processors, Inc., and the accounts receivable of Color Processors, Inc., in order to secure the obligations" due Pettigrew. The security interest was to be filed by a financing statement under the Montana Uniform Commercial Code with the Secretary of State. A financing instrument was filed on December 11, 1981, from Barrie E. Smith in the equipment, furniture and accounts receivable of Color Processors, Inc., but the corporation made no financing agreement (nor security agreement). Thus, the financing statement did not bind the corporation. Pettigrew claims such failure is fraud. The October 30, 1981, agreement further provides that the agreement "supersedes and modifies the real and personal property distribution provisions of the Marital and Property Settlement Agreement entered into on the 10th day of June, 1976, by and between the Transferor and Transferee, and that all rights, obligations and liabilities of the parties under the property distribution provisions, Paragraphs V and VI, of the Marital and Property Settlement Agreement shall be terminated, provided the payments required hereit are fully performed and satisfied". Moreover, if the payments are not made, "The Marital and Property Settlement Agreement shall be reinstated".

Pettigrew's complaint requests one of three alternative forms of relief, which are:

1. Declare that Pettigrew's consent to the stock transfer agreement was induced by the fraud of Smith, and therefore, Smith's obligations pursuant to that agreement are non-dischargeable, or

2. Declare the amounts Pettigrew was to receive pursuant to the stock transfer agreement were in lieu of maintenance and child support, and therefore, non-dischargeable; or

3. Declare that upon default of the stock purchase agreement, that agreement is now at an end and the Marital and Property Settlement Agreement reinstated, so that Pettigrew will be entitled to receive the amounts due her as maintenance and child support, with such sum being non-dischargeable under Section 523(a)(5)(B) of the Code.

Smith began making child support payments in May, 1984, after ceasing corporate payments. Pettigrew claims there is due and owing to her under the stock transfer agreement the sum of $140,519.01.

▇▇▇ An obligation to a former spouse for alimony, maintenance, or support for the spouse or child, in connection with a separation agreement or divorce decree is not dischargeable in a bankruptcy proceeding if the debt is actually in the nature of alimony, maintenance or support. 11 U.S.C. 523(a)(5)(B). In determining whether an obligation is intended for support of a former spouse, the court must look beyond the language of the decree to the intent of the parties and the substance of the obligation. *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir.1984). *Shaver* teaches the court must look to the entire property set-

tlement to see if the obligation was intended as a property division or as support payments. A significant factor in determining whether a provision is actually in the nature of maintenance or support is whether there are other provisions in the agreement separate and distinct from the provision in question which are designated as support payments and which terminate at a specific date or upon a specific event. *Stout v. Prussel*, 691 F.2d 859, 861 (9th Cir.1982). And while the court is not bound by a label attached to provisions in the agreement, *Shaver, id.* at 1316, the captions are worth some weight when the agreement is considered as a whole. Obligations terminating on the death or remarriage of a recipient spouse are inclined to be classified as support. *Matter of Albin*, 591 F.2d 94, 97 (9th Cir.1979).

Smith is in this court under Chapter 11 of the Code, and testified that he does not believe he owes Pettigrew any further moneys because of payments to her of over $369,102.00. He concedes the $150.00 per month for child support is non-dischargeable.

■ I hold and find the moneys due under the Marital and Property Settlement Agreement and the stock transfer agreement are not in the nature of support or maintenance. The agreement between the parties, incorporated by the decree of divorce, made separate and distinct provisions for child support, and specified the amount. At the time of the divorce, the parties were co-owners of the business, and provided for a division of those assets in accordance with their stock ownership. The business was to be sold, and if not, then Smith had to continue payments to Pettigrew until sale. That agreement was later modified, again with respect to the property of the parties and not as to child support, by the stock purchase agreement. The parties intended to dispose of their stock interests in the corporation in addition to making a separate provision for child support. Certainly the income to Pettigrew from the business dictated the amount of child support, but the obligation to pay her for her stock continued under the agreements beyond remarriage or death. As stated in *Shaver* at 1316:

"A property settlement would not be affected by the personal circumstances of the recipient spouse; thus, a change in those circumstances would not affect a true property settlement, although it would affect the needs for support. The court will look also to nature and duration of the obligation to determine whether it is intended as support. Thus, such payments are generally made directly to the recipient spouse and are paid in installments over a substantial period of time."

In *Shaver*, the agreement provided for substantial monthly payments over ten years, but the payments were to cease upon her death within that term. The court found such provision as consistent with a support obligation. Here, the stock purchase agreement, as well as the Property Settlement Agreement, provided for payment to her for her stock, until that interest was paid in full, irrespective of her death or remarriage. The fact that she waived a normal support payment during the time she received a corporate salary, did not deter from the obligation to pay her in full for her stock interest. Finally, the stock transfer agreement, which is the basis for her present claim of $140,579.01, is silent on support, and specifically amends the property division sections of the Marital Agreement, but not the support provision. The provisions for support and sale of the stock are separate and distinct.

The remaining issue deals with the alleged fraud of the Debtor in execution of the stock transfer agreement of October 30, 1981, and his subsequent failure to provide Pettigrew with a valid security interest in the corporation assets. Pettigrew stated that adequate security for repayment was a material part of the transaction as far as she was concerned and she would not have signed the agreement in the absence of such security. She further testified that the Debtor's attorney and accountant assured her she would be ade-

quately protected for the payment of her stock. The stock purchase agreement itself provides for such protection. It is noteworthy, however, that the Debtor did in fact execute along with Pettigrew a purported financing statement which was filed with the Secretary of State seeking to encumber the corporate assets. The Debtor asserts two principle defenses, first, there is no debt owing to Pettigrew which can be held non-dischargeable, and second, the Debtor never intended to perpetrate any fraud upon Pettigrew.

■ The Debtor claims that Pettigrew received $232,602.88 from June, 1976, to October, 1981, and then received $136,500.00 from October, 1981, to the present, and as such she was paid in full for her stock interest. I disagree. The stock transfer agreement of October 30, 1981, called for the payment to Pettigrew of $220,000.00, and was executed after Smith had paid her the $232,602.88. Such payment of $220,000.00 bound Smith to payment of that sum. Indeed, Smith's Bankruptcy Schedule A–3, lists Patti Smith Pettigrew as a creditor in the sum of $147,273.00, secured by equipment and furniture, accounts receivable of CPI, 1975 Maserati and 1968 Corvette. In a separate proceeding dealing with a motion for relief from stay filed by Pettigrew, the parties stipulated that "the balance owed by Barrie Smith to Patricia Marie Smith Pettigrew under the terms of the stock transfer agreement of October 30, 1981, is $140,579.01". The Debtor can't have it both ways, and switch his legal theory to find a convenient accommodation for a new, or later, defense. The debt of $140,579.01 is owed Pettigrew based on the stock transfer agreement.

■ Under Section 523(a)(2)(A), the debt which is non-dischargeable is based upon fraud which involves moral turpitude or intentional wrong, and fraud implied by law which may exist without imputation of bad faith or immorality is insufficient.

"It must further affirmatively appear that such representations were knowingly and fraudulently made, and that were relied upon by the other party. * * * a mere promise to be executed in the future is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach. * * To require an overt misrepresentation when hopeless insolvency makes payment impossible, is an unduly restricted interpretation of the Bankruptcy Code. * * * A debtor who has made no false representation himself, may, nevertheless, be bound by the fraud of an agent acting within the scope of his authority." 3 *Collier on Bankruptcy*, Section 523.-08, pp. 523–44 to 52.

Further, the creditor must sustain a loss as a proximate result of the false representation. *In Re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975). The rule is further well established that an action of deceit does not lie for failure on the part of a promisor to perform a promise made by him to do sometime in the future, which he does not intend to do and subsequently refuses to do, although the promisee has acted in reliance on such promise to his damage. *In Re Buttendorf*, 11 B.R. 558, 562 (Bankr. Vt.1981). The mere making of a promise which the promisor fails to keep is not actionable fraud. Rather one must prove that the maker of the promise had no intention of performing it when he made it. *Howe v. Messimer*, 84 Mont. 304, 275 P. 281, 283 (1929); *Svennungsen v. Svennungsen*, 165 Mont. 161, 527 P.2d 640, 644 (1974). The case of *In Re Hospelhorn*, 18 B.R. 395, (Bankr.S.D.Ohio 1981), relied on by Pettigrew, involved a case where the Debtor knew at the time he borrowed money from the creditor that he would not give the creditor a first lien on property to be improved by the Debtor. The facts *sub judice* are different. The Debtor did attempt to grant a first lien on the corporate property, and there is no evidence in this record, that on October 30, 1981, when he signed the agreement, that he intentionally would not grant such lien protection.

■ Finally, the creditor has failed to show that a duly perfected security interest in the corporate assets would have pro-

748

tected her interests, and thus failed to prove damage. The schedules in this case show that First National Bank has a first lien position on accounts receivable and equipment in the amount of $390,000.00 and Eastman Kodak has a second lien position for its debt in the sum of $280,325.00. The creditor failed to show that such lien interests were not in existence in 1981, or that her lien position would have adequately protected her debt. In sum, she failed to prove any loss or damages as a result of the faulty lien filing.

IT IS ORDERED the complaint seeking relief for non-dischargeable debt under Section 523 of the Code is dismissed.